Points decided.

[No. 1555.]

THE STATE OF NEVADA, EX REL. WILLIAM McMIL-
LAN, RELATOR, v. REINHOLD SADLER, RESPOND-
ENT.

QUO WARRANTO — JURISDICTION — ATTORNEY-GENERAL — CONTESTED ELEC-
TION FOR STATE OFFICE. Where the attorney-general refuses to
bring an action under the provisions of section 3342, General Stat-
utes, authorizing such officer to proceed against any person he has
reason to believe unlawfully holds a public office, a person claiming
election to a state office may, by leave of court, bring *quo warranto*
on his own relation, where he has no other remedy.

IDEM—ELECTION CONTEST. *Quo warranto* is the only remedy a person,
who may be duly elected to a state office, has to oust one unlaw-
fully holding the same, and have himself instituted.

ELECTIONS—INSPECTORS AND CLERKS—POLITICAL AFFILIATION OF—DIRECT-
ORY PROVISION OF STATUTE. The provision of the statute providing
that inspectors and clerks of election "shall not be appointed from
the same political party" is directory, and non-compliance there-
with, in the absence of fraud, is not sufficient ground for rejecting
the vote of a county or precinct.

IDEM—MANDATORY PROVISIONS OF STATUTE. It is only those provisions
of the election law relating to the time and place of holding elec-
tions, the qualifications of voters, and such others as are made
essential prerequisites to the validity of an election that are man-
datory.

IDEM—MISCONDUCT OF OFFICERS AND OTHER PERSONS. When a candidate
for an office does not participate in, or have knowledge of, criminal
violations of election statutes at a precinct, and when such acts do
not make or lose votes for any candidate for such office, or destroy
the secrecy of the ballot, or cast uncertainty on the result of
the election, and no elector voting at such precinct participates
in such acts, or is prevented from voting or properly marking his
ballot, and no disqualified person is allowed to vote, the votes cast
at such precinct for such office are valid.

IDEM—SOLDIERS' VOTE. The act of congress enabling the people of
Nevada Territory to submit a constitution to a vote, and providing
for taking the vote of electors in the United States army within or
beyond the territory, does not apply to elections held by the state
since the adoption of its constitution, and there being no act of the
legislature authorizing the taking of such a vote, a vote so taken
cannot be considered.

IDEM—COUNCILMEN OF CITY OF RENO, HOW ELECTED. Section 3 of the act
incorporating the city of Reno (Stats. 1897, p. 50) provides that its
councilmen shall be chosen by the "electors thereof," but requires
them to be residents of different wards. Section 5 provides that
"there shall be elected one councilman in each ward," who shall
be a resident therein: *Held*, that each councilman must be chosen
by the electors of his ward only.

Points decided.

IDEM—BALLOTS—NAMES NOT AUTHORIZED. A ballot containing the names of candidates for offices which do not belong on it, in the absence of fraud, is not invalid as to candidates for another and different kind of office. (*Sweeney* v. *Hjul*, 23 Nev. 409, overruled upon this point.)

IDEM—CONSTITUTIONAL LAW—STATE SENATOR—STATE AND FEDERAL OFFICE. Under art. IV, sec. 9 of the state constitution, which provides that no person holding a lucrative office under the federal government shall be eligible to any civil office of profit in the state, a state senator, by accepting appointment as paymaster in the army, became incapable of legally holding the office of state senator, and that such acceptance operated as a resignation of the state office and created a vacancy therein.

IDEM—STATE SENATOR—VACANCY—PROCLAMATION OF GOVERNOR. Where a vacancy occurs in the office of state senator by reason of the appointment of such officer to a federal position, no proclamation of the governor, as provided for under General Statutes, sec. 1668, is necessary to enable the people to legally fill said vacancy, where no session of the legislature is to take place between the date of the occurrence of said vacancy and the next general election.

IDEM—REGISTRATION—DISABILITY OF AGENT—ACTS OF OTHER PERSON ILLEGAL. Section 1501 of the General Statutes provides for a registration officer, and section 1519 provides for the filling of a vacancy in said office caused by his death or resignation. No provision is made for registration in case of any other disability: *Held*, that registration by one acting for him while sick is without authority.

IDEM—IDEM—IDEM. An elector whose name appears on a check list and copy of an official register furnished the election officers by the regular registry agent is entitled to vote, under registry act, sec. 14 (Gen. Stats. 1514), which provides that, *prima facie*, one has such right when his name so appears, although he was registered by one illegally acting for the registry agent.

IDEM—INSPECTORS—MINISTERIAL OFFICERS. The inspectors of election are only ministerial officers and have no right to refuse to receive the vote of a person whose name appears upon the check list and official register furnished them by the regular registry agent, except upon failure of the person applying to prove his identity as the person who was registered.

IDEM—REGISTRATION—ELECTION PRECINCTS—TRANSFERS. Under section 10 of the registry act, providing that a voter registered in one district and moving to another may procure a certificate of his registration and be registered in such other district, a voter, registered in a county where election precincts are not properly established and bounded, may take such certificate and be registered and vote at any other polling place in the county.

IDEM—BALLOTS—PURITY OF ELECTIONS LAW—DISTINGUISHING MARKS. In all cases where the elector had attempted to make the cross and had actually made the so so-called letters "Y," "T," "V," or the same inverted, or where the same resembles the figure "4," or a double cross, where it is apparent the voter attempted to retrace the lines, or crosses, made with curved or irregular lines, evidently the result of nervousness or infirmity, or the roughness of the

Points decided.

boards upon which it was marked, also where the ballot contains marks evidently the result of accident, or written words evidently placed thereon by the election officers after the ballot had been cast; also, slight attempts at erasure, also crosses made with a slight hook, and other defects of a similar nature, such ballots will be counted.

IDEM—IDEM—IDEM—IDEM. The following were held to be distinguishing marks requiring the rejection of the ballot: With horizontal lines thereon; marked with capital " W " and horizontal line; with vertical line; circular loop; crosses erased or scratched out with pencil; erasures destroying texture of paper; containing unauthorized written words apparently placed thereon before the ballot was cast; crosses on various parts of ballot not after the name of a candidate; with letter "D" in official heading scratched over deliberately with lead pencil; marks resembling stars and spiders; with the figure "1" after the cross; printed words or names scratched over with pencil; two crosses after name of candidate; crosses enclosed with letter "O"; perpendicular lines instead of crosses; with letter "S" and vertical line drawn through same; crosses placed at left of name voted for; equation marks between printed name and party designation; two vertical lines instead of cross; with letter "N" and horizontal line across same; with ordinary business check mark; other marks impossible to describe.

IDEM—IDEM—IDEM—IDEM—TWO CANDIDATES FOR SAME OFFICE VOTED FOR. Ballots where the voter voted for more candidates for the same office than were to be elected are not void, but such ballot will not be counted for such office.

IDEM—IDEM—IDEM—IDEM—INK OR COLORED PENCIL. Ballots marked with a blue or purple pencil, or with ink, held void.

IDEM—IDEM—IDEM—IDEM—CROSS OR LINE BETWEEN NAMES OF CANDIDATES. Ballots with crosses directly on the line between the names of the contesting candidates, in such a position as to prevent the court from determining for what candidate the same were intended to be cast, are not void, but will not be counted for the office in question.

IDEM—IDEM—IDEM—IDEM—CROSSES NOT IN SQUARES. Ballots having crosses not in the square prepared thereon in printing, but after and to the right of the names of the candidates voted for, are valid.

IDEM—IDEM—IDEM—IDEM—NUMBER OF BALLOT NOT DETACHED. Ballots were cast having attached the strip on the right-hand side containing the number: *Held*, that the ballots should be counted.

IDEM—IDEM—IDEM—RESIGNATION OF CANDIDATE. The resignation of M., who was a candidate for member of the assembly, was filed with the clerk and by him accepted after the name had been printed on the official ballots. The clerk not being able to get sufficient ballot paper from the secretary of state to reprint the full allotment of ballots for his county, drew red lines through M.'s name on said ballots, and distributed them, together with the new ballots printed without his name, to election officers at the various precincts. In a precinct where there were sufficient new ballots for all persons who voted, several red line ballots were cast: *Held*, that the red line ballots were void.

IDEM—IDEM—IDEM—IDEM—UNIFORMITY OF BALLOT. Under the election law which requires uniformity of ballots, and does not provide in terms for the resignation of candidates and the substitution of others in their place, no officer can lawfully make any change on the face of ballots whereby more than one kind are prepared and used; nor can any change be made on them, in reference to the resignation and substitution, other than writing or printing the name of the substituted candidate.

## ON MOTION TO RETAX COSTS.

COSTS IN ORIGINAL PROCEEDINGS. There being no statute or rule of court requiring papers constituting the record in original proceedings in the supreme court to be printed or typewritten, expense for having any such papers printed cannot be taxed as costs under rule VI, subdivision 1, of the supreme court providing that where the rule requires such printing the expense therefor may be charged as costs.

IDEM—TIME FOR OBJECTING TO COST BILL. By the last clause of subdivision 3 of rule VI of the supreme court, objections, to be available against costs claimed by a prevailing party, must be made within ten days after the filing and service of the cost bill.

IDEM—NECESSARY EXPRESSAGE. Where it was necessary to send ballots by express, in order to produce them in court in answer to process, expressage is properly taxed as costs.

## ON MOTION TO RECONSIDER MOTION TO RETAX COSTS.

COSTS—COST BILL FILED PREMATURELY. Rule VI, subdivision 2, of the supreme court provides that either party desiring to recover as costs his expenses for printing or typewriting in any cause in this court shall file with the clerk, before said cause is submitted, a verified cost bill; and subdivision 3 requires that, if either party desires to object to the costs claimed by the other party, he shall file his objections with the clerk within ten days after service on him of a copy of the cost bill: *Held*, that where a party did not object by the costs claimed by the other party within ten days after the service on him of the cost bill, the judgment will not be modified by striking out the items of cost, after they have entered into and become a part of the judgment, simply because the cost bill was prematurely filed.

ORIGINAL PROCEEDING. Action by the State of Nevada, on the relation of William McMillan, against Reinhold Sadler. Writ of *quo warranto* refused.

The facts sufficiently appear in the opinion.

*Trenmor Coffin, A. E. Cheney, M. A. Murphy, Samuel Platt, E. D. Vanderlieth* and *O. J. Smith*, for Relator:

I. The proceeding in *quo warranto* may be in the name of the state, without the attorney-general, upon the relation of a private citizen, or upon the relation of one claiming the

office in question, upon leave of court. (State Const., art. VI, sec. 4; *State* v. *McCullough,* 3 Nev. 202; *O'Neale* v. *McClinton,* 5 Nev. 329; *State* v. *Ruhe,* 52 Pac. Rep. 274; *People* v. *Regents,* 49 Pac. Rep. (Col.) 286–88; Gen. Stats. 1780; High, Extr. Leg. Rem. 606; *State* v. *Brown,* 5 R. I. 1, 6; Meacham on Pub. Off., secs. 483 and 484; *Vroman* v. *Michie,* 69 Mich. 42; *State* v. *Frazier,* 28 Neb. 438; *State* v. *Boyd,* 31 Neb. 690; *State* v. *Lynn,* 31 Neb. 772.) *Quo warranto* lies to oust the incumbent of the office of governor upon the relation of the rival claimant to the office and to try relator's right to the office and to put him into the office, without the attorney-general joining in the proceeding. (*State* v. *Boyd,* 31 Neb. 690.)

II. *Quo warranto* is the proper proceeding. In this proceeding the qualifications of voters, conduct of election officers, counting of ballots, canvass of returns, and all steps leading up to the taking of the office may be inquired into. (High, Extr. Leg. Rem. sec. 638, and authorities cited; McCrary, Elect. 468; Spell. Extr. Rel., sec. 1776, p. 1447; *People* v. *Van Slyck,* 4 Cow. 297; *People* v. *Pease,* 27 N. Y. 45; 84 Am. Dec. 242, and notes and authorities; *State* v. *Frazier,* 28 Neb. 438; Am. & Eng. Ency. of Law, 2d ed., vol. 10, pp. 798–9, and notes and authorities; vol. 19, 1st ed., 673, notes 3 and 4.) Ballots may be inspected and recounted. (*State* v. *Shay,* 101 Ind. 36, 38; *Jennet* v. *Owens,* 63 Tex. 262, authorities on 270; *De Berry* v. *Nicholson,* 102 N. C. 469; *Hudson* v. *Solomon,* 19 Kan. 177; *State* v. *Meilike,* 81 Wis. 574.) The court may canvass the returns and count the ballots, if they have not been counted or canvassed. (*Dean* v. *State,* 88 Tex. 291.)

III. Statutes providing for an election contest are no bar to proceedings in *quo warranto,* but afford a concurrent and cumulative remedy. (McCrary, Elect. 360; *People* v. *Holden,* 28 Cal. 123; *Greely* v. *Holland,* 14 Nev. 320; *State* v. *Adams,* 65 Ind. 396–7; *State* v. *Shay,* 101 Ind. 36, 38; *State* v. *Fransham,* 19 Mont. 273, 279, *et seq.,* and authorities cited; *State* v. *Frazier,* 28 Neb. 438, 456–7; Spell. Extr. Rel. 1776; High, Extr. Leg. Rem. 624; *People* v. *Londoner,* 13 Colo. 303; *Snowball* v. *People,* 147 Ill. 260; *State* v. *McKinnon,* 8 Or. 493; *McAllen* v. *Rhodes,* 65 Tex. 348; *People* v. *Hall,* 80 N. Y. 117;

*Tarbox* v. *Sughrue*, 36 Kan. 225; *State* v. *Kempf*, 69 Wis. 470; *State* v. *Meilike*, 81 Wis. 574; *Park* v. *State*, 100 Ala. 647–8; *State* v. *Elliott*, 23 South. Rep. (Ala.) 124.)

IV.   Upon *quo warranto* the court will determine the right of relator as well as that of the respondent to the office, and, if the determination is in favor of the relator, will oust the respondent and put the relator in possession of the office. (Gen. Stats. 3343–5; C. C. P. of Cal. 804–6; *State* v. *Clarke*, 3 Nev. 565, 572; *People* v. *Banvard*, 27 Cal. 470; *People* v. *Fleming*, 100 Cal. 537; *Jennet* v. *Owens*, 63 Tex. 262; *McAllen* v. *Rhodes*, 65 Tex. 348; *Hudson* v. *Solomon*, 19 Kan. 177–8; *Tarbox* v. *Sughrue*, 36 Kan. 225; *State* v. *Frazier*, 28 Neb. 438; *State* v. *Boyd*, 31 Neb. 690; *State* v. *Lynn*, 31 Neb. 772–4 *Lindsay* v. *Attorney-General*, 33 Miss. 508, 525; *Newsome* v. *Cooke*, 44 Miss. 352; *Griebel* v. *State*, 111 Ind. 272–3, and authorities cited; *State* v. *Wright*, 10 Heisk (Tenn.) 238, 260–62; *State* v. *McGeary*, 69 Vt. 461, 468.)

V.   The fact that all of the inspectors or clerks at a given precinct were of the same political party with respondent is material to be considered in connection with other facts alleged in the information, and more especially when in any precinct all of both inspectors and clerks were of the same political party as respondent.   (*Sandens* v. *Lacks*, 43 S. W. (Mo.) 653, 655; 142 Mo. 256, 264–5; *Dial* v. *Hollandsworth*, 39 W. Va. 1, 3, also dissenting opinion and authorities cited, pp. 6 to 17.)

VI.   The acts alleged in the information of intoxication and riotous conduct on the part of the inspectors and electors of certain precincts, and acts in violation of the secrecy of the ballot, constitute such malconduct within the meaning of the statute as should reject the entire vote of those precincts. (McCrary, Elect. 207; *Tebbe* v. *Smith*, 108 Cal. 110–12; *Attorney-Genl.* v. *Stillson*, 108 Mich. 419; *Russell* v. *McDowell*, 83 Cal. 70, 77; *Ex Parte Arnold*, 128 Mo. 260–61; *People* v. *Pease*, 27 N. Y. 81; Am. & Eng. Ency. of Law, 2d ed., vol. 10, p. 585, note 4, pp. 698–9, and note 1.)

VII.   The right of relator cannot be reached by respondent's demurrer.   Respondent's interest in the case ends with the determination of his right to the office.   If the allegations of the information are sufficient to oust respondent, he

cannot complain at any determination the court may make
as to relator's rights. (*Flynn* v. *Abbott*, 16 Cal. 365; *People*
v. *Fleming*, 100 Cal. 541.)

VIII.  There is no question involved here concerning the
form of ballots, or manner of voting.  The allegations of
the information, confessed by the demurrer, are that the
members of the cavalry troop voted according to law, which
includes the Australian law and all other laws in force.  The
question as argued by respondent's counsel was mainly the
return and canvass of the vote.  Section 3, article II of the
constitution vests an absolute right of suffrage in such citi-
zens as are enlisted in the military or naval service of the
United States without compliance with the registration laws.
The last clause of this section contains a reference to other
provisions of the constitution upon this subject.  These pro-
visions are found in the election ordinance in the latter part
of the constitution.  Section 3 of article II, together with the
election ordinance of the constitution, are self-executing.
(Cooley, Const. Lim, pp. 99, 100.)  Section XIV of the ordi-
nance continued all of the provisions of the ordinance which
relate to the soldiers' vote in force until the legislature should
substitute other provisions concerning the taking and can-
vassing of this vote.  A statute passed in 1866 (Stats. 1866,
p. 210), concerning elections, made provision for the soldiers'
vote.  This statute doubtless suspended and took the place
of the election ordinance of the constitution.  This act of 1866
provided that the soldiers' vote should be returned to the sec-
retary of state and that the state board of canvassers should
meet at the office of the secretary of state and open and can-
vass the votes.  (Stats. 1866, pp. 215 to 217.)  A later act
concerning elections passed in 1873 (Stats. 1873, p. 197)
apparently attempted to repeal the act of 1866 (repealing
clause, 1873, p. 215) without making any new provision con-
cerning the soldiers' vote.  The apparent attempt, even if it
was intended to be real, to repeal the entire act of 1866 can-
not be held to have been effectual, for the reason that the
repealing clause of the act of 1873 (p. 215, sec. 95) fails to
properly or correctly refer to the act of 1866 attempted to be
repealed.  The title of the act of 1866 is not properly set out.
The words "election returns and canvassing the same" are

omitted.   These words constitute a material portion of the title, and are peculiarly significant in view of the question at bar.   The omission of this portion of the title of the act of 1866 makes the repealing clause of the act of 1873 inoperative.   (*State* v. *Hallock*, 19 Nev. 384; *Boring* v. *State*, 141 Ind. 640, 643; *Feebleman* v. *State*, 98 Ind. 520–21; *State* v. *Wright*, 14 Or. 365; *State* v. *Looker*, 54 Kan. 229; *Gunter* v. *Tex. Land Co.*, 82 Tex. 497; *Harland* v. *Territory*, 3 Wash. 150–57.)

IX.   Where there is a constitutional right and no machinery provided to enforce it, the constitution, by necessary implication, confers on the court of chancery jurisdiction to protect and enforce the will of the people by suitable and proper procedure.   (*Gibson* v. *Board of Sup.*, 80 Cal. 362 to 366; *Calaveras Co.* v. *Brockway*, 30 Cal. 326; *Stalcup* v. *Tacoma*, 13 Wash. 141, 145, 151; *State* v. *Circuit Judge*, 9 Ala. 338, 344; *People* v. *Co. Comrs.*, 6 Colo. 209; *In re Moore*, 4 Wy. 98, 112–13.)

X.   Under the Australian ballot law, the clerk is required to publish all nominations certified to him, and to print such nominations upon the ballots.   No other ballots could be used.   A method is provided by which any errors in the proposed ballots could be corrected.   Nothing to the contrary appearing, it must be presumed that all names on the ballots were properly certified to the clerk.   (Australian Ballot Law, Stats. 1891, p. 40, secs. 9, 11, 12, 15; Stats. 1893, p. 114, sec. 4.)   After the ballots are thus prepared and printed they are not subject to objection as to their form.   Ballots will not be rejected by reason of names being wrongfully placed thereon by the clerk.   The voter must of necessity use the ballots prepared and distributed by the clerk.   In so doing the elector cannot be at fault.   (*Bowers* v. *Smith*, 111 Mo. 45, 52, 56, 57, 64, 65; *State* v. *Fransham*, 19 Mont. 273; *State* v. *Bernholz* (Ia.), 76 N. W. 662, and authorities cited; *Bragdon* v. *Navarre*, 102 Mich. 259; Am. & Eng. Ency. of Law, 2d ed., vol. 10, pp. 714, 722, and numerous authorities therein cited.)

XI.   "No person holding any lucrative office under the government of the United States, or any foreign power, shall be eligible to any civil office of profit under this state; *pro-*

*vided*, that postmasters whose compensation does not exceed five hundred dollars per annum, or commissioners of deeds, shall not be deemed as holding a lucrative office." (Const. Nev., art. IV, sec. 9.) The words "shall be ineligible to any office of profit" have twice been construed, and held by this court to mean both "incapable of being legally chosen" and "incapable of legally holding." (3 Nev. 570; 21 Nev. 338.) The appointment of Colonel F. C. Lord to the office of paymaster in the army rendered him incapable of longer legally holding the office of state senator. His appointment to that office created a vacancy in the office of state senator from Storey county. (As to the rank and pay of paymaster, see Rev. Stats. of U. S., secs. 1182, 1184, 1261, 1269 and 1271; salary, $2,500 per year.) (*State* v. *Clarke*, 3 Nev. 556, 570; *State* v. *Clarke*, 21 Nev. 333, 338; *State* v. *Murry*, 28 Wis. 98, 99; *Carson* v. *McPhetridge*, 15 Ind. 327, 331; *People* v. *Leonard*, 73 Cal. 230, 233-4; *Brady* v. *Howe*, 50 Miss. 607, 626-7; McCrary, Elect. 4th ed., sec. 336, 340 and authorities cited; *Shell* v. *Cousins*, 77 Va. 328; *State* v. *Delwood*, 33 La. Ann. 1229; *State* v. *West*, 33 La. Ann. 1261; *State* v. *Arata*, 32 La. Ann. 193; 19 Am. & Eng. Ency., title "Pub. Off.," "Resignation," p. 562; "Acceptance of Incompatible Office," p. 562; "Abandonment," 562c.)

XII. We are unable to find any law or decision in this state either requiring, authorizing, or permitting the governor to issue an election proclamation prior to an election. The notice of election in this state must be given by the boards of county commissioners. (Gen. Stats. 1527.) The presumption of law is that the board of county commissioners of Storey county performed their official duty and regularly gave due and legal notice of the election of a state senator to fill the unexpired term of Colonel Lord. Such is also the fact. No writ of election was required in order to elect a senator to fill the unexpired term of Colonel Lord as senator from Storey, for the reason that no session of the legislature was to take place in the interim between his appointment as paymaster and the next ensuing general election. (Const. Nevada, art. IV, sec. 12; Gen. Stats. 1668.)

XIII. Conceding that no official proclamation or notice or writ of any kind was in fact given or issued concerning

the election of a state senator from Storey to fill the unex-
pired term of Colonel Lord, the election officers and electors
of Storey county were in law required to take notice of the
vacancy, and were of right entitled to nominate and vote for
candidates for the vacant seat in the state senate, and such
election was legal and valid. (*People* v. *Cowles*, 13 N. Y.
350; *People* v. *Hartwell*, 12 Mich. 508, 523; 86 Am. Dec. 70;
*Adsit* v. *Sec. of State*, 84 Mich. 420, and authorities cited;
*Berry* v. *McCullough*, 94 Ky. 247, 252–3; *Stearit* v. *McAdams*,
99 Ky. 37, 40, 41; *People* v. *Brenham*, 3 Cal. 477, 491; *State*
v. *Burbridge*, 24 Fla. 112; *Jones* v. *Gridley*, 20 Kan. 584;
*State* v. *Skirving*, 19 Neb. 497; *State* v. *Lansing*, 46 Neb.
515; *Carson* v. *McPhetridge*, 15 Ind. 327, 331; *LaFayette* v.
*State*, 69 Ind. 218; *Brady* v. *Howe*, 50 Miss. 626–7; *Foster* v.
*Scarff*, 15 Ohio St. 536–7; *Ex Parte Schilling* (Tex.), 42 S.
W. 553; *Ex Parte Williams*, 35 Tex. Crim. App. 75; Am. &
Eng. Ency. Law, 2d ed., vol. 10, 625 to 628, and authorities
cited: *Dishon* v. *Smith*, 10 Iowa, 212, 218; *State* v. *Orvis*, 20
Wis. 235; *State* v. *Lutfring*, 22 Wis. 363; *State* v. *Carroll*, 17
R. I. 591, authorities cited on pp. 595–6; *People* v. *Hoges*, 55
Cal. 612, 619.)

XIV. In addition to the cases above cited, the following
are also applicable to the ballots printed and cast in the city
of Reno as alleged in respondent's answer. The city charter
of Reno does not, as alleged by respondent, provide that the
five city councilmen shall be elected by wards, but does pro-
vide that they be elected by the electors of the entire city.
(Incorporation Act, Stats. 1897, p. 50, secs. 3 and 5.) The
principle of an officer limited to a residence in a local dis-
trict or county, but voted for by the electors of other districts
or counties, is not new; it has been applied to the district
judges of this state. (Gen. Stats. 2487, 2492.)

XV. It is nowhere alleged or suggested in the answer that
the electors of Storey county did not believe and did not have
reason to believe that there was a vacancy in the office of
state senator from that county; or that the electors of the
city of Reno did not believe that their city charter authorized
each elector of the city to vote for five councilmen, one to
reside in each of the five wards. The phase of the case most
favorable to respondent, which can upon any hypothesis be

maintained, is that it is a doubtful or debatable question whether or no there was a vacancy in Storey county, or whether the electors of Reno should have each voted for five councilmen or for only one. We venture the assertion that no case can be found in which it is so much as intimated that a rule or decision could be tolerated which would visit upon a whole county, city or community, entire disfranchisement because the people had failed to correctly solve a doubtful proposition of law.

XVI.    Shall the people of Storey county be disfranchised because they expressed, through their ballots, an honest opinion upon this doubtful and vexed question, adverse to a majority of our state senators, although in accord with the opinion of a committee of congress and the great majority of the decided cases? It will be suggested by respondent that this proceeding affects the right to no other office than that of governor. The decree in this case will not confirm in an office nor oust therefrom any other officer, but if this court in this case should hold all of the ballots cast in Storey county to be illegal, it will open the way for any citizen of Storey county to proceed against and oust from office every officer now exercising the functions of a county office in the county. The same entanglements and official disorder might result in Washoe county from holding the ballots cast in Reno illegal by reason of the method adopted by the entire body of citizens in electing their city councilmen.

XVII.    Whenever the interpretation of a statute or constitution in a certain way will result in manifest injustice, or public inconvenience, courts will always scrutinize the statute or constitution closely to see if it will not admit of some other interpretation. (*State* v. *Kruttschnitt*, 4 Nev. 178; *Arnold* v. *Stevenson*, 2 Nev. 234, 242; *Haydon* v. *Supervisors*, 2 Nev. 371; *Bowers* v. *Smith*, 111 Mo. 56.)

XVIII.    It seems well settled by a great number of authorities that a vote for an ineligible person will not render the vote illegal, unless the voter had full knowledge of both the fact of ineligibility and of its legal effect. (Am. & Eng. Ency. Law, 2d ed., vol. 10, pp. 758 to 760, notes and authorities cited.)

XIX.    Now, what difference in principle can there be

between the electors of Storey county voting unknowingly for an ineligible candidate to fill a vacant office, and their voting, in good faith, for an eligible candidate to fill an office which they believe to be vacant, although they may have been mistaken as to the vacancy? In either instance the voter is only at fault when it clearly appears that he marked his ballot for a candidate or an office that he must have known could not lawfully be voted for by him, and when with such knowledge the only inference to be drawn from his action in voting for such person or office, is that he intended thereby to make a distinguishing or identifying mark upon his ballot. (*Sweeney* v. *Hjul*, 23 · Nev. 409, 419–20.) The same reasoning applies with equal force to the city vote of Reno, where the electors of the city believed that their city charter called upon each elector to vote for five councilmen, rather than for one councilman residing in his own ward. The good faith of the electors, neither of Storey county nor of Reno, is questioned, nor is there any allegation of any knowledge on their part that the manner of their voting, nor the legality of their votes for the persons and officers for whom they were voting was, or would be, or could be, questioned. The facts admitted by the demurrer "are not strong enough to outweigh the more important and controlling principle that the electors who do not make up the ballot must rely with perfect assurance and safety upon the official ballots given them, and that their ballots will be counted as marked, and that their legally expressed will cannot be overthrown where they are not at fault, although it should turn out" that they were mistaken in their construction of a statute or a principle of law. (*State* v. *Fransham*, 19 Mont. 273, 285–90; see, also, to same effect, *Bragdon* v. *Navarre*, 102 Mich. 259; Dillon's Mun. Cor., vol. 1, sec. 197, and authorities cited; Beach on Pub. Cor., vol. 1, sec. 149, and authorities cited; *Owens* v. *State*, 64 Tex. 509.)

XX. A precinct, town, or city, or county will not be disfranchised by rejecting the entire vote on account of irregularities resulting from the election officers, or the electors, acting in good faith, having mistaken the law concerning the holding of, or voting at, an election. (*Stemper* v. *Higgins*, 38 Minn. 222, 225–6; *Bowers* v. *Smith*, 111 Mo. 46, 54–56,

62–5; *Marion* v. *Territory*, 1 Okl. 221; *Stinson* v. *Sweeney*, 17 Nev. 318; *Lynip* v. *Buckner*, 22 Nev. 438.)

XXI. Irregularities in conducting an election when free of fraud, which have not interfered with a full and fair expression of the voter's choice, and which do not affect the result, are unprejudicial irregularities, and will not render the election void. (*Lee* v. *State*, 49 Ala. 55; *Bourland* v. *Hildreth*, 26 Cal. 162; *Sprague* v. *Norway*, 31 Cal. 173; *Preston* v. *Culbertson*, 58 Cal. 209; *Russell* v. *McDowell*, 83 Cal. 70; *Atkinson* v. *Lorbeer*, 111 Cal. 419; *Kellog* v. *Hickman*, 12 Colo. 257; *Hyatt* v. *People*, 29 Ill. 54; *Gas* v. *State*, 34 Ind. 425; *Mustard* v. *Hoppes*, 69 Ind. 334; *Morris* v. *Van Laningham*, 11 Kan. 269; *People* v. *Avary*, 102 Mich. 574; *Bowers* v. *Smith*, 111 Mo. 45; *State* v. *Nicholson*, 102 N. C. 465; *Marion* v. *Territory*, 1 Okl. 221; *Hanna* v. *Sheppard* (Tex.), 25 S. W. 137; *State* v. *Horan*, 85 Wis. 94; *Prince* v. *Skillon*, 71 Maine, 361; *Juker* v. *Commonwealth*, 20 Penn. St. 493; Cooley's Const. Lim. 617, 618.)

XXII. Ignorance, inadvertence, mistake or even intentional wrong, on the part of local officials, will not vitiate an election or disfranchise a district. To so hold would be unjust in the extreme, and subversive of the fundamental principles of our government. (*People* v. *Cook*, 14 Barb. (N. Y.) 259; *Gilleleand* v. *Schuyler*, 9 Kan. 569; *Parvin* v. *Wimberg*, 130 Ind. 568.)

XXIII. Statutory regulations regarding the appointment of inspectors, judges and clerks are directory, and a nonobservance thereof will not render an election void. (*Keller* v. *Chapman*, 34 Cal. 635; *People* v. *Cook*, 14 Barb. 259; *McCabe* v. *Arcularins*, N. Y. Cont. Elec. Cases, 333; *Hanna* v. *Sheppard* (Tex.), 25 S. W. 137; *Chapman* v. *State*, 37 Tex. Crim. 176; *State* v. *Stumpf*, 21 Wis. 586; *Sanders* v. *Lacks*, 142 Mo. 261–2.)

XXIV. It is only those provisions relating to the time and place of holding elections, the qualifications of voters, that the voting shall be by ballot, and such others as are expressly made essential prerequisites to the election's validity, that are held of substance and mandatory. Those touching the recording and return of the legal votes received, and the mode and manner of conducting the details of the elec-

tion, are directory, and a failure to observe them caused by negligence, honest ignorance or mistake, and not resulting in manifest fraud, does not vitiate the election. (*People* v. *Schirmerhorn*, 19 Barb. 540; *People* v. *Wilson*, 62 N. Y. 193; *Dickinson* v. *Fried* (Colo.), 55 Pac. 814; *Russell* v. *McDowell*, 83 Cal. 77; *Fowler* v. *State*, 68 Tex. 35; *Mustard* v. *Hoppes*, 69 Ind. 334; *Atkinson* v. *Lorbeer*, 111 Cal. 422; *Young* v. *Simpson*, 21 Colo. 460.)

XXV.   The object of the registration law " was to prevent unregistered voters from voting, and not to make the right to vote depend upon the observance of all the minute directions of the act as to the preparation of the agency, and thus make the constitutional right of suffrage liable to be defeated, without the fault of the electors by reason of the fraud, caprice or negligence of the inspectors." (*People* v. *Wilson*, 62 N. Y. 186; Am. & Eng. Ency. Law, p. 618, and authorities cited; *State* v. *Kromer*, 38 Wis. 88, 89; McCrary, Elect., 2d ed., p. 69, sec. 105; 45 La. Ann. 333, 340; 69 Hun, N. Y. 596; *State* v. *Weed*, 60 Conn. 18; *Sprague* v. *Norway*, 31 Cal. 113, affirmed in *Keller* v. *Chapman*, 34 Cal. 640; *Stinson* v. *Sweeney*, 17 Nev. 318–320.)

XXVI.   The language of section 3 of the Reno incorporation act (Stats. 1897, p. 50)—" a city council to consist of five members who shall be actual residents   *   *   *   in the city, and who shall be chosen, by the qualified electors thereof " means that they shall be chosen by all of the electors thereof.   It does not mean by the electors of respective wards.   (*State* v. *Wrightson*, 56 N. J. Law, 126, 177, 192, 199; *State* v. *Constantine*, 42 Ohio St. 437; 51 Am. Rep. 833, 836–7.)   An examination of other city incorporation acts will show that where the legislature has intended that a vote should be by wards, it has been so provided in no doubtful language.

XXVII.   Passing now from the question of the regularity of the Reno ballots, and admitting for the purpose of the argument that it is doubtful and uncertain whether the Reno ballot was properly printed, the question arises, was the voter charged with any knowledge of that irregularity, and was he at fault in voting it, as prepared, to such an extent as justifies the disfranchisement of all the voters of the city

of Reno? The principles governing the decision of this question are alike applicable to the tickets in Reno and Storey county, with the possible difference that it may be claimed that the Reno ballot did impart some notice, which could not be urged for the Storey ballot. We believe the principles governing this question are already established in this state, and that, unless a new rule of decision is to be now adopted, there is no uncertainty as to the validity of all these ballots, and an examination of somewhat extended excerpts from the decisions of this court is invited. We insist that the decisions of this court support these propositions: First, that the wrongful putting of the name of a candidate on the ticket by those charged with the duty of impairing, does not impair the vote. Second, that the fault that invalidates the ticket must be one with which the elector had knowledge or notice. Third, that the statutes are to be liberally construed to preserve, and not to destroy the franchise, especially where it is not alleged that any fraud was attempted, or any vote cast by an unauthorized person. Fourth, no elector shall lose his ballot upon any doubtful construction of the law. Fifth, that neither justice, the preservation of secrecy of the ballot, nor any legislative enactment, imposes the burden on the elector of determining, at his peril, whether the ticket prepared and presented to him by the officers of the law, and regular 'upon its face, is, in fact, a full compliance with the legal requirements. Sixth, an elector cannot be deprived of his constitutional right of suffrage without his fault or neglect, and any law or regulation, which, in its operation, accomplishes that result, is unconstitutional. (*Stinson* v. *Sweeney*, 17 Nev. 315.)

XXVIII. Although this case was decided before the adoption of the Australian ballot law, the main principles thus adopted as the rule of decision in this state are as pertinent now as then, namely, that the constitutional right of a qualified voter to have his vote counted as cast cannot be taken from him by any legislature, regulation or official dereliction or misinterpretation of the law, unless the voter is guilty himself of fault or neglect. (*Lynip* v. *Buckner*, 22 Nev. 426; *Dennis* v. *Caughlin*, 22 Nev. 447; *Sweeney* v. *Hjul*, 23 Nev. 409; *Lindstrom* v. *Bd. Canvassers*, 94 Mich. 467; *Bragdon* v.

*Navarre,* 102 Mich. 259; *Bowers* v. *Smith,* 111 Mo. 45; *Parvin* v. *Wimberg,* 130 Ind. 561.)

XXIX. Conceding that the names of Conboie and Davis were illegally upon the ballots in Storey county, and that they were improperly certified by the clerk as nominees, but were in good faith voted for by the electors of Storey county, that fact cannot deprive voters of their franchise or destroy the efficacy of their ballots cast for other candidates, who were properly nominated and certified. (*Smith* v. *Harris,* 18 Colo. 274, 278; *Allen* v. *Glynn,* 17 Colo. 338; *Schuler* v. *Hogan,* 168 Ill. 369, 377; *People* v. *Clute,* 50 N. Y. 466; *Barnum* v. *Gilman,* 27 Minn. 473; *Gill* v. *Mayor Pawtucket,* 18 R. I. 281.)

XXX. Upon the oral argument much was said concerning the consequences of holding the Storey county ballots illegal. It was urged by counsel for respondent that all consequences should be ignored in a decision by this court upon a question of law. One pointed and forcible illustration of this principle, furnished by the records of this supreme court and of the secretary of state's office, was, however, overlooked. In this state, at the general election in 1896, the secretary of state certified to the various county clerks the nomination of C. H. E. Hardin as a candidate for lieutenant-governor on the silver party and democratic tickets; J. B. Moore for the same office on the republican ticket and George Cummings upon the people's party ticket. Mr. Hardin received 6,237 votes, Mr. Moore received 2,411 votes, and Mr. Cummings received 1,076 votes, aggregating 9,724 votes. The total vote cast in the state at that election seems to have been 10,237, leaving only 513 electors who did not vote for a candidate for lieutenant-governor. It is most probable that those electors who voted for a candidate for lieutenant-governor did so in good faith, believing there was a vacancy in that office. However, their belief was a false one. They were mistaken, for this court afterward decided that there was in fact no vacancy in that office. (*State* v. *Sadler,* 23 Nev. 356.) We know of no principle of law which would authorize this court to reject a ballot that should not have been rejected by the inspectors of election at the original count at the closing of the polls. If the Storey county

votes should now be rejected by this court, they should also have been rejected by the inspectors at their original count, and their returns to the county commissioners made accordingly. Likewise the ballots in 1896 containing a cross after the name.of the candidates for lieutenant-governor should have been rejected by the inspectors of election at their original count, leaving only 513 legal votes in the state. The result would have been, either that 513 votes would have controlled the entire election, or that, under the principle laid down in 15 Ohio St. 536–7, and other authorities cited, there would have been no election, leaving all state, county, township and other offices to hold over, except members of the legislature, all of whose terms of office save a few hold-over senators, expired unconditionally on the day of election in November, 1896. There would have been no assembly and but half a senate. A vacancy in the office of United States senator and a want of means to carry on the state government might have resulted. These, however, were simply consequences, which counsel for respondent, if they remained true to their position taken in this case, would urge should be ignored.

XXXI. Another similar case might arise where to follow a too close and technical construction of the law, or to follow the theory and argument of counsel to their logical conclusions, would lead to great injustice or great public inconvenience. (*State* v. *Kruttschnitt,* 4 Nev. 178; *Arnold* v. *Stevenson,* 2 Nev. 234, 242; *Haydon* v. *Supervisors,* 2 Nev. 371; *Bowers* v. *Smith,* 11 Mo. 45, 56; *Lynip* v. *Buckner,* 22 Nev. 438, 440, 442; *Parvin* v. *Wimberg,* 130 Ind. 561; *Lindstrom* v. *Board,* 94 Mich. 467.)

XXXII. It may well be said that electors are presumed to know the law, but are not and cannot be presumed to know of its violations, nor of irregularities or mistakes, intentional or otherwise, committed by public officers in carrying out its provisions. On the contrary, they are entitled to presume that the officers have done their duty, and have correctly construed and followed the law. Courts will not disfranchise voters unless it is shown that they were charged with knowledge and fault. Notice goes with punishment and knowledge is essential to crime. (*Allen* v. *Glynn,* 17

Colo. 338; *State* v. *Elliott*, 17 Wash. 18; *State* v. *Fransham*, 19 Mont. 288–9; *Schuyler* v. *Hogan*, 168 Ill. 381–2; *Cook* v. *Fisher*, 100 Iowa, 35; Am. & Eng. Ency. Law, 2d ed., vol. 10, pp. 714, 722, and authorities cited.)

XXXIII. The vacancy mentioned in section 12, art. IV of the constitution and in section 1671, Gen. Stats., is not a "vacancy (which) shall occur in the office of member of the senate or assembly by death, resignation or otherwise, when a session of the legislature is (not) to take place before the next general election." (Gen. Stats. 1668.) In the interim of the sessions of the legislature, the terms used, we believe, by all constitutions, statutes and decisions, are "senator and member of the assembly," "office of senator or member of the assembly," and "vacancy in the office of senator or member of the assembly," or their equivalents. (Const. of Nevada, art. IV, secs. 3, 4, 5, 8, 11; Gen. Stats. 1668, 1669, 1670, 1674.) Upon the technical theory urged by respondent there was no way for the governor to have had official information of the vacancy of the term of office of Colonel Lord. There was no way for the president of the senate to have such official information or to certify it to the governor, unless it occurred during a session of the legislature. The same would be true if Colonel Lord would have died in July, 1898, instead of being appointed paymaster in the army. Such an iron-clad and narrow construction will be found to begin at nothing and to end at nowhere.

RELATOR'S POINTS AND AUTHORITIES ON MOTION TO STRIKE OUT AND RETAX COSTS.

I. A party in whose favor judgment is rendered and who claims his costs must, within two days after the verdict or decision of the court, deliver to the clerk of the court a memorandum of his costs and necessary disbursements in the action or proceeding, properly verified. (Gen. Stats. 3508.) In this case the decision of the court and the judgment in favor of relator were rendered and entered on September 20, 1899. No such memorandum of costs and disbursements has been filed since the rendering and entering of said decision and judgment.

II. A memorandum of costs and disbursements must be

filed within the time and in the manner required by law.  A
failure on the part of the prevailing party to file such mem-
orandum constitutes a waiver of costs and disbursements.
*Howard* v. *Richards*, 2 Nev. 128; *Lapham* v. *Osborne*, 20 Nev.
168, 177; 90 Am. Dec. 520; *Chapin* v. *Broder*, 16 Cal. 403,
418, 419; *O'Neil* v. *Donahue*, 57 Cal. 231; *Mullally* v. *Benevo-
lent Society*, 69 Cal. 559; *Riddell* v. *Harrell*, 71 Cal. 254, 260–
61; *Dow* v. *Ross*, 90 Cal. 562; *Hotchkiss* v. *Smith*, 108 Cal.
285, 286–7; *Cantwell* v. *McPherson*, 2 Idaho, 1045, 1047.)
Costs are not recoverable at common law.  (*McDonald* v.
*Evans*, 3 Or. 445; *Wood* v. *Fitzgerald*, 3 Or. 583–4; Ency. Pl.
& Pr. " Costs," vol. 5, p. 110, and authorities cited; *Orr* v.
*Haskell*, 2 Mont. 353–4.)

III.   The right to recover costs is a statutory right, and
the statute giving the right must be strictly followed or costs
cannot be recovered.  Costs can only be recovered by a
strict compliance with the practice act.  (*Orr* v. *Haskell*, 2
Mont. 350, 354.)   Statutes allowing costs are strictly con-
strued.  (*Jackson* v. *Siglin*, 10 Or. 93; Dwarris on Stat-
utes, 253.)

IV.   In this case a so-called "cost bill" was filed with the
clerk on July 25, 1899, nearly two months before the decision
and judgment.  This filing of a cost bill was premature and
can be of no more effect than if filed two months after the
decision and judgment.  (*Sellick* v. *DeCarlow*, 95 Cal. 645–5;
*Nellis* v. *DeForrest*, 6 How. Pr. (N. Y.) 413.)

V.   The filing of a paper, notice or motion prior to the
time fixed by law for its filing or the taking of any step, or
the doing of anything in the practice prematurely, is as
ineffectual as if done after the expiration of the time pre-
scribed or allowed.  (*Henry* v. *Superior Court*, 93 Cal. 569.)

VI.   The right to costs does not attach or become vested
until final judgment has been pronounced, and only then
when they are claimed and taxed in the manner prescribed
by law.  (Ency. Pl. & Pr., vol. 5, p. 121, and authorities
there and hereinbefore cited.)

VII.   It may be contended that the cost bill filed herein
on July 25, 1899, was effectual to allow respondent his costs
under rule VI of this court.  However, an examination of
that rule discloses that it was never intended that it should

have any such effect. That rule appears upon its face to apply only to the cost of printing and typewriting, in cases where the transcript or record is required by the rules of this court to be printed or typewritten, and we are unable to find any rule requiring the record in an original proceeding in this court to be printed or typewritten. It is therefore plain that rule VI of this court was only intended to apply to transcripts in cases on appeal.

VIII. A simple inspection of rule VI will disclose that it was never intended to apply to any other items of costs or disbursements, than "expenses for printing or typewriting." Rule VI in terms provides "all other costs to be taxed by the clerk in accordance with the fee bill." The term "fee bill" must be understood to mean and include the statutes fixing the fees taxable, and the mode and manner of taxing them. (Anderson's Dictionary of Law, p. 453; Black's Law Dictionary, p. 481.)

IX. There seems to be no time fixed by any rule of this court, or by any statute, within which a motion to retax costs shall be made in an original proceeding in this court or concerning any costs in any case except as to the expenses of printing or typewriting, to be included in a cost bill before final submission of an appellate case. "When there is no time specified when an act is to be done, it will be presumed in law that it is to be done within a reasonable time." (*Richardson* v. *Jones,* 1 Nev. 405, 409.)

*Thomas Wren, William Woodburn, J. R. Judge, R. M. Clarke, E. L. Sadler,* and *A. J. McGowan,* for Respondent:

I. The election ordinance was passed by the constitutional convention with the enabling act of congress requir-. ing the convention to provide by ordinance for submitting the constitution to the people. It was never intended to be and is not a part of the constitution. (Election Ordinance, sec. 228.) In section 6 of the ordinance the following language occurs: "The governor  *  *  *  shall certify the same to the president,  *  *  *  together with a copy of the constitution and ordinance." This view is strengthened by the fact that section 3 of article II of the constitution provides that persons in the military or naval service of

the United States may vote.   By reference to section 230 of the ordinance it will be seen that the language used in the ordinance in reference to the right of the soldiers to vote and the language used in section 3 of the constitution is substantially different and inconsistent.   The ordinance not only confers the right to vote on soldiers both "within and beyond the boundaries of the state," but it also provides in the main how they are to vote and how the returns of their vote is to be made.   Section 3 of article II of the constitution simply provides that the soldiers and sailors, like all other citizens, shall have the right to vote and exempts them from the payment of a poll tax and registration as prerequisite to the exercise of that right omitting the words "within or beyond the boundaries of the state."   That section and section 6 of the same article of the constitution empower the legislature to prescribe where all citizens shall vote, soldiers and sailors included, by whom their vote shall be received, and the manner in which the return of their vote shall be made, and to provide safeguards generally for the purity of elections.   It is not to be presumed that the constitutional convention would have adopted two sections of the constitution so radically different intending that both should be permanent.   But if it was the intention by section 12 of the ordinance (Gen. Stats. 240) to continue the provision of the ordinance in force after the election of state and county officers under the constitution, its provisions are so incongruous that, when the state was admitted into the Union and the state officers had been installed in offices, it became impossible in holding elections to follow it.   Section 5 of the ordinance (Gen. Stats. 233) provides that an abstract of the votes for state officers, supreme and district judges, representatives in congress and three presidential electors shall be transmitted to the governor of said territory.   Section 6 of the ordinance (Gen. Stats. 234) provides that the board of canvassers, to consist of the governor, United States district attorney, and chief justice of said territory, shall canvass the returns.   Counsel upon both sides to some extent have fallen into the error in discussing this phrase of assuming that the words "governor" and "United States district attorney" were not qualified by the phrase "of said territory."   Mani-

festly, the latter phrase qualifies the title of all three of the officers above named.  Section 6 of the ordinance also provides that the said governor shall immediately publish an abstract of the same, etc., and that the said board of canvassers shall issue certificate of election, etc.  Section 7 of the ordinance (Gen. Stats. 235) provides that the adjutant-general of said territory shall make out a list and deliver the same to the governor of all of the electors in the army of the United States, etc.  The governor shall classify and make therefrom separate lists of the electors and transmit the same to the commanding officer, etc.  Section 9 of the ordinance provides for taking the vote, etc.  Section 11 of the ordinance provides that the ballots and voting list shall be sent forthwith to the governor of said territory, and that the returns shall be transmitted to the governor, etc.

II.  It became utterly impossible to comply with these provisions of the election ordinance after the state was organized and the territory with its officers ceased to exist except for the limited time provided for in section 214, General Statutes.  (Section 14, article XVII of the schedule to the constitution.)  Section 14 of the ordinance was limited in its operation by the terms used.  It was to be in full force until the legislature should provide for the taking of the votes of the soldiers.  The legislature has ever since its first organization made provision for taking the votes of all residents of this state entitled to the right of suffrage.  Section 14 of the ordinance does not provide that the ordinance shall remain in force until the legislature has provided for taking the votes of the soldiers "within or beyond the limits of the state." The law of 1866 provides for the taking of the soldiers' vote beyond the boundaries of the state, but that law was repealed by the legislature in 1873.  The mere fact that a few words of the title were omitted in the repealing clause of the law, especially in view of the fact that the date of the approval of the act of 1866 is given in connection with the title in the repealing clause of the act, does not invalidate the repeal.  Under the provisions of the act of 1873, the soldiers and sailors in the military and naval service of the United States are not deprived of their right to vote, if stationed within this state; if without the state or the county in which they

reside, they simply occupy precisely the same position under the statute that other citizens of the state absent from the state or county in which they reside occupy. (Stats. 1873, p. 197.)

III.   No fraud or unfairness is stated to have occurred in consequence of the appointment of the boards of election in the several precincts of Humboldt county from the same political party.   (*Stinson* v. *Sweeney*, 17 Nev. 309.)

IV.   The board of inspectors are not authorized, nor is it made their duty to prevent bystanders or electors from gathering in crowds or soliciting votes within one hundred feet of the polling place, or immediately at the polling place or in the room where the election is held, or immediately about the voting booths.   The definition of the word " immediately " in the connection in which it is used in the allegation is not very precise; it may be fairly defined as " close to."   It is not very clear what the phrase " polling place " means; we suppose it would be a fair definition to call the space enclosed by the guard rail the polling place.   It is common for the county commissioners to designate some house in a precinct as a polling place.   The use of the language " so as to destroy the secrecy of the ballot " is too indefinite.   If the pleader had alleged that the inspectors of election permitted parties, other than voters or officers invited inside the guard rail to preserve the peace, to enter inside the rail and around the booths, and to invade the booths, and that the voters were thereby prevented from preparing their ballots in secret, the allegation might have possibly been sufficient, but not so in its present form.

V.   The election law contemplates that voters may gather around the polling place and inside the room where the election is being held, and that the booths shall be so placed that persons just outside of the guard rail shall have the booths in full view to prevent fraud.   (Stats. 1891, sec. 18, p. 42.)   The sections of the constitution empowering the legislature to regulate the exercise of the elective franchise are certainly of equal force and dignity with the section of the constitution regulating the right of suffrage.   The sections must be construed together.

VI.   *Appointment of Election Officers:*   It is no cause of

action or ground for throwing out the entire vote of Kennedy and White River precincts that inspectors of election were not appointed from the two political parties polling the largest number of votes at the last general election. Neither is it a cause of action or ground for throwing out the entire vote of the above-named precincts that clerks of election were all appointed from the silver party. (*Sanders* v. *Lacks*, 142 Mo. 255; Paine on Elections, sec. 397.)

VII. The statute of the State of Nevada in question here provides no penalty for failure to comply with the requirements in regard to the appointment of inspectors and clerks of election from two political parties and does not declare that such failure avoids the election. (Stats. 1891, p. 44, sec. 17.)

VIII. There is no showing in the complaint that any other or different political party than the silver party existed in either of the counties where the above alleged malconduct of the boards of county commissioners is alleged to have occurred. Moreover, the provisions of the election laws in this respect are directory merely (Gen. Stats. 1525; Stats. 1891, p. 44, sec. 17), and, no fraud being alleged, it is no ground for throwing out the vote of an entire precinct. "Where no fraud is charged the provisions of election laws are merely directory and not mandatory." (6 Am. & Eng. Ency. Law, p. 302 and cases cited; 6 Am. & Eng. Ency. of Law, p. 325, and cases cited; *Packwood* v. *Brownell*, 121 Cal. 478; *Jennings* v. *Brown*, 114 Cal. 307.)

IX. "It is only those provisions of election laws relating to the time and place of holding elections, the qualification of voters and such others as are made essential prerequisites to the validity of elections, that are mandatory; all other are directory merely and an honest or mistaken disregard of them, not resulting in manifest fraud, will not reject the entire vote of a precinct." (*Russell* v. *McDowell*, 83 Cal. 70.)

X. *Malconduct of Election Officers:* It is no cause of action that electors congregated in and about the polling place; that they engaged in partisan discussions concerning the merits of the different candidates; that the election officers participated in the same; or that the election officers gave to and received from each other and drank spirituous,

malt and intoxicating liquors, there being no allegation or
showing in the complaint that any fraud was committed or
that the result of the election was in any way changed
or altered. (*Stinson* v. *Sweeney*, 17 Nev. 309; *People* v. *Wilson*,
62 N. Y. 193; *Packwood* v. *Brownell*, 121 Cal. 478; *Sprague* v.
*Norway*, 31 Cal. 173; *Dobyns* v. *Weaden*, 50 Ind. 298; *Whipley*
v. *McCune*, 12 Cal. 352; *Preston* v. *Culbertson*, 58 Cal. 198;
Paine on Elections, 418; Brightly on Election Cases, 423;
*Atkinson* v. *Lorbeer*, 111 Cal. 419; 6 Am. & Eng. Ency. of
Law, pp. 302, 325, 359, 364; McCrary on Elections, sec. 430,
329; *Trigg* v. *Preston*, 1 Cong. Elec. Cases, 78; *Bruce* v. *Loan*,
2 Cong. Elec. Cases, 482; *Richardson* v. *Rainey*, 5 Cong. Elec.
Cases, 224; *Harrison* v. *Davis*, 2 Cong. Elec. Cases, 341;
*Bromburg* v. *Haralson*, 4 Cong. Elec. Cases, 336; *Lee* v. *Richardson*, 6 Cong. Elec. Cases, 520.)

XI. The proceeding is brought in the name of the State
of Nevada upon the relation of William McMillan. It is
neither brought by the attorney-general as the prosecuting
officer of the state in this court, nor on the relation of such
attorney-general, nor with his consent. On the contrary, it
is brought without the consent of the attorney-general.

XII. It is nowhere alleged as ground of contest: That
the respondent had not the " title " to the office of governor;
or that the respondent was not and is not " eligible to said
office"; or that he is in any manner " disqualified " to hold
the said office or execute the functions thereof; or that he
has in any manner " forfeited " his right or title to the same;
or that the election whereat he was chosen governor by the
people was a " fraudulent election." In short, none of the
grounds justifying the issuance of the ancient common law
writ of *quo warranto*, or the more recent and common law
writ " upon information in the nature of *quo warranto*," are
alleged, and only such grounds as appertain strictly to " contested elections " under the statute authorizing a proceeding
between individuals contesting an election are contained in
the statement. Indeed, many things contained in the statement are not such as under the authorities constitute grounds
for contesting an election. From the foregoing statement it
is plainly manifest that the proceeding is one in which the
state is not a party and which is brought, not for the purpose

of ousting one who has usurped an office, but for the sole purpose of contesting an election. In other words it is an "election contest" and not a proceeding *quo warranto* or "in the nature of *quo warranto*."

XIII. The statutes of Nevada provide three distinct and independent modes of proceeding to determine the title to, and right to execute the functions of, a state office. First: An action under the provisions of the civil practice act of the state for "the usurpation of an office." (Gen. Stats. 3342–3348.) Second: A proceeding upon "information in the nature of *quo warranto*." (Gen. Stats. 3711–3737.) Third: A proceeding "to contest the right of any person declared duly elected to any state office within this state." (Gen. Stats. 1560–1563, 1581–1583.) The proceeding under section 3345–3346 (the first above mentioned) is criminal in its nature, and must be brought in the name of the state by the attorney-general of the state, and upon his relation. It may be brought either in the supreme court or the district court of the state, but cannot be brought by a private individual in his own name or upon his own relation. (Gen. Stats. 3342–3348.) The proceeding under sections 3711–3737 are of a civil and not criminal nature and may be brought by the district attorney of the proper county, and must be brought in the district court, and cannot be brought in the supreme court. This last proceeding may be "upon the relation of a private individual" (Gen. Stats. 3722), but must be prosecuted by the district attorney. (Gen. Stats. 3712, 3713, 3715.) The proceeding under the statute providing for an "election contest" may be brought by "any qualified elector" of the state who desires "to contest the election of any person declared duly elected to any state office" (Gen. Stats. 1581), and it is "the duty of the attorney-general to prosecute such action in the name of the people of the state, before the supreme court, who shall have original jurisdiction in such cases." (Gen. Stats. 1581.)

XIV. The jurisdiction of the Supreme Court of the State of Nevada is fixed by the constitution of the state and in the matter under consideration is limited to granting "writs of * * * *quo warranto*." (Const. Nev., art. IV, sec. 4.) The jurisdiction conferred upon the supreme court by the con-

stitution cannot be abolished or restricted or enlarged or increased by the legislature. (Spell. Extr. Rel. 1770, 1771, 1773, 1873; High, Extr. Leg. Rem. 610, 611, 612, 613, 614; 30 Kan. 661, 665; 5 Kan. 213; 44 N. J. L. 470; 17 R. I. 391.)

XV. The provisions of our law (Gen. Stats. 1560–1563, 1571–1581), providing for an "election contest," create a distinct remedy differing substantially from either *quo warranto* or information in the nature of *quo warranto*. The remedy to contest an election is a special proceeding and must be strictly pursued. (Gen. Stats. 1560, 1585.) In place of an information or complaint, a written statement (Gen. Stats. 1562) "or specification of the grounds of contest shall be filed." (Gen. Stats. 1581.) In place of a warrant or summons "the time and place to hear and determine such contested election is fixed by the judge" (Gen. Stats. 1575), or, in the case of a state office, "the justices * * * shall have power to issue such process as may be necessary to a complete hearing and final determination of such action." (Gen. Stats. 1581.) Special grounds of contest are prescribed, and, in case of a contest for a county office at least, the contest must be instituted within forty days after the person whose office is contested has been "declared duly elected to such office." (Sec. 1562.) In case the reception of illegal votes is alleged as "the cause of contest," the "party contesting such election shall deliver to the opposite party, at least three days before such trial, a written list of the number of illegal votes and by whom given, which he intends to prove on such trial." (Gen. Stats. 1563.) Damages may be given in favor of the persons bringing the contest in case he shall prevail. (Gen. Stats. 1573.) In all respects, therefore, the proceeding to contest an election is special and statutory, and is in no sense a proceeding under the common law such as is the proceeding *quo warranto* or information in the nature of *quo warranto*. (*Garrard* v. *Gallagher*, 11 Nev. 382; *Dorsey* v. *Barry*, 24 Cal. 449; *Cosgrove* v. *Howland*, 24 Cal. 457; *Kellner* v. *Chapman*, 34 Cal. 635; *French* v. *Leighty*, 9 Ind. 475; *Knox* v. *Fesler*, 17 Ind. 254; *State, ex rel. Grissel* v. *Marlowe*, 15 Ohio St. 114; *Peck* v. *Weddell*, 17 Ohio St. 271; *O'Doherty* v. *Archer*, 9 Tex. 295; *Wright* v. *Fassett*, 42 Tex. 203; *Rodgers* v. *Johns*, 42 Tex. 339;

*Commonwealth, ex rel. McCurdy* v. *Leach,* 44 Pa. St. 332; *Selleck* v. *Common Council of South Norwalk,* 40 Conn. 359; *Saunders* v. *Haynes,* 13 Cal. 145; *People* v. *Holden,* 28 Cal. 123.)

XVI.   From the foregoing text books and cases it is apparent that *quo warranto* proceedings and proceedings to contest an election are distinct and substantially different; that the former is a proceeding upon the part of the sovereign and is at the common law, and that the latter is a special proceeding provided by the statute and instituted by a private individual to determine which of the parties, the contestant or the contestee, is entitled to have the office.   It is further apparent that in the proceeding *quo warranto* the matters which may be tried in an election contest cannot be heard or determined by the court; in fact, it appears that only such questions as relate to the title or commission under which the claimant holds his right to the office or the eligibility of the claimant to take the office or the forfeiture of the office by the claimant occurring since the election and in some cases under special provisions of the law whether the election itself . was fraudulently held.

XVII.   The act incorporating the city of Reno divides the city into five wards.   (Stats. 1897, sec. 2, p. 51.)   Section 5 of the act provides "That at the general election in November, 1898, and at each general election thereafter there shall be elected one councilman in each ward, who shall be a resident of such ward."   (Stats. 1897, p. 52; Dillon on Mun. Corp., p. 120, sec. 19.)   Dividing the city into wards, and bestowing upon each ward the right to elect one member of the city council, is in strict accordance with the American policy of local self-government.

XVIII.   There was no vacancy in the office of senator from Storey county for the term for which Lord had been elected.   (Gen. Stats. 1670; Const. Nev., art IV, sec. 6.) Section 6, article IV, provides that the senate shall be the sole judge of the election and qualifications of its members. The senate is the exclusive judge.   (*People* v. *Metzgar,* 47 Cal. 524; Cooley's Const. Lim., p. 133; *People* v. *Mahoney,* 13 Mich. 481; *State* v. *Jarret,* 17 Marl. 309; *Lamb* v. *Lynd,* 44 Pa. St. 337; Law and Practice of Legislative Assemblies,

Cushing, p. 54.)　There being no vacancy in the office of senator, printing his name on the ticket was clearly illegal. (Const. Nev., art. IV, sec. 12; art. VII, sec. 4; Gen. Stats. 1671, 1674.)

XIX.　An election held to fill a vacancy in the office of state senator is absolutely invalid and void, unless the governor of the state has previously issued a proclamation or writ of election calling a special election therefor.　(Const. Nev., art. IV, sec. 12; *People* v. *Porter*, 6 Cal. 26; *People, ex rel. McCune* v. *John B. Weller*, 11 Cal. 49; *People* v. *Martin*, 12 Cal. 409; *Kenfield* v. *Irwin*, 52 Cal. 164.)

XX.　Entering the names of three hundred persons on the register in the township of Reno was clearly illegal.　(Gen. Stats. 1501, 1503, 1505, 1506, 1507; *Stinson* v. *Sweeney*, 17 Nev. 310; *Lynip* v. *Buckner*, 22 Nev. 426; *Sweeney* v. *Hjul*, 23 Nev. 310.)

XXI.　Ballots cast at the last election in Storey county for J. A. Conboie to fill the unexpired term of the office of state senator should not be counted, because there was no unexpired term.　There was but one state senator to be elected for a full term.　It is undisputed that one F. C. Lord was elected state senator for Storey county for the full term of four years at the general election held in 1897.　He has been the incumbent of the office ever since and was a member of the senate just adjourned and still holds the office.　It therefore follows that the name of Conboie was illegally placed on the tickets prepared by the election officers; the crosses after his name are not after the name of any candidate.　This court has decided that an elector placing a cross after the name of a candidate for justice of the peace of a township in which he did not reside was a distinguishing mark and the ticket could not be counted.　It must be a distinguishing mark to place a cross after the name of a person who runs for an office having no existence.　(*Sweeney* v. *Hjul*, 23 Nev. 419.)

XXII.　Voters are not presumed to know the fact that an officer has resigned or died.　The function of the proclamation is to proclaim the fact of vacancy.　(*People, ex rel. Atty.-Genl.* v. *Burbank*, 12 Cal. 378; *Tillson* v. *Ford*, 53 Cal. 701.)

XXIII.　It is well settled, both on principle and authority,

that when the law prescribes certain requisites in the ballot, and follows it with denunciation, that, unless the ballot complies with the law, "it shall not be counted"—then the statute is mandatory—and non-compliance therewith will void the election. (*Price* v. *Lush*, 24 Pac. Rep. 749, and cases cited; 10 Mont. Rep.; *Sweeney* v. *Hjul*, 23 Nev. 409; *Taylor* v. *Bleakley*, 39 Pac. Rep. 1045; *Richardson* v. *Jamison*, 39 Pac. Rep. 1050; *Curran* v. *Clayton*, 86 Me. 42; *Layes* v. *Parsons*, 104 Cal. 661; *Ellis* v. *Glaser*, 61 N. W. Rep. 648; *Dennis* v. *Caughlin*, 22 Nev. 447; *Lynip* v. *Buckner*, 22 Nev. 426.)

XXIV. Any mark on ballot made by the voter, except the X in the space opposite the name of the candidate for office, and whose name has been legally placed upon the ballot, is a distinguishing mark and makes the ballot void. (*Lindstrom* v. *Board Canvassers*, 94 Mich. 467; *Whittman* v. *Zahorik*, 59 N. W. 57; *Kearns* v. *Edwards* (N. J. Sup.), 28 A. 723; *Spurgin* v. *Thompson*, 37 Neb. 39; *State* v. *Henry*, 62 Conn. 269; *Bechtel* v. *Alvin*, 134 Ind. 193.)

XXV. Conceding that the act incorporating the town of Reno provides that the councilmen are to be elected by wards and not on a general ticket, and the question is a very simple one under the authority of *Sweeney* v. *Hjul*. All of the ballots cast having crosses opposite the name of more than one candidate for councilman should be rejected. (*Sweeney* v. *Hjul*, 23 Nev. 409.)

XXVI. Upon what theory did the court proceed in the case of *Sweeney* v. *Hjul*, in holding that the voters in Eureka were at fault when they cast ballots with the numbers of the stubs attached? It was undoubtedly upon the theory that "every man is presumed to know the law." No man can shield himself from the consequences of an illegal act upon the plea that he did not know the law. When the ballots with the stubs attached were handed to the voters at Eureka by the inspector they could see the number on the stubs. But the voter must be presumed to have known that for that reason the ballot was illegal. The ballot alone did not inform him of that fact, so, when some of the voters in Eureka county at the election two years ago found the names of the candidates for township offices of two townships in Eureka county printed on the tickets, nothing upon them indicated for whom

the voters were legally entitled to vote. To learn that, they would have to go to the statutes to ascertain the same and to the records of the board of county commissioners to ascertain the boundaries of the townships. Do not the voters of Storey county occupy the same position? Are they not presumed to know the law? Are they to be permitted to shield themselves from the consequences of their illegal acts upon the plea that they did not know the law? They knew, or must be presumed to have known, that Conboie's name had been placed on the ticket in violation of the law. They knew, or must be presumed to have known, that making a cross opposite the name of Conboie was illegal and would invalidate the ballot. The question was not a new one; they had not only the statutes to guide them, but two decisions of this court also. The only difference between Storey and Eureka counties for the present year would be the number of ballots that would be rejected, if this court adheres to its ruling in *Sweeney* v. *Hjul.* The same reasoning applies to the vote of Reno.

XXVII. In regard to the voters whose names were entered in the register by parties other than the registry agent, we are not aware of any decision by this court directly upon the point. In *Stinson* v. *Sweeney,* the court say that in so far as it may be necessary to preserve the purity of elections the law in regard to registration should be strictly construed. (*Stinson v. Sweeney,* 17 Nev. 309.) Is it not absolutely essential, in order to prevent the registration of parties not entitled to vote, to require registration by a sworn officer who is authorized to administer oaths, etc.? (Gen. Stats. 1501, 1507.) In this case the allegation is made the stronger on account of the absence of the registry agent and to keep his office open to receive objections to voters, and his failure to post lists of voters as required by law. Are we to be held to allege and prove that all of these persons, whose names were entered upon the register in violation of law, were not entitled to registration? Where the number is so large that would be indeed an impossible task. These people knew who the registry agent was and they were chiefly at fault for permitting an unauthorized party to enter their names on the register in violation of the law.

XXVIII. The senate under our constitution is made the exclusive judge of the election, qualification and returns of its members as well as of the right to determine when a vacancy occurs in that body. (*Hughes* v. *Felton*, 11 Cal. 489; *People* v. *Mahaney*, 13 Mich. 481; *State* v. *Gilmore*, 20 Kan. 551; Cooley, Const. Lim. 133; *Kearns* v. *Edwards*, 28 Atl. Rep. 723.)

XXIX. Where an election is not called by proper authority, as for senator in Storey county, the fact that the people voted for a candidate put in nomination will not render such election valid. (*People* v. *Palmer*, 51 N. W. 999; *People* v. *Porter*, 6 Cal. 26; *People* v. *Martin*, 12 Cal. 409.)

RESPONDENT'S POINTS AND AUTHORITIES ON MOTION TO STRIKE OUT AND RETAX COSTS.

I. Rule VI of this court, authorizing the filing of cost bills in proceedings before the court, provides: "If either party desires to object to the costs claimed by the opposite party, he shall, within ten days after the service upon him of a copy of the cost bill, file with the clerk and serve his objections. Said objections shall be heard and settled and the costs taxed by the clerk." The cost bill was filed and served on July 25th; no objection was made to the same, nor to any item therein set forth, within the ten days required by the rule, nor was any objection taken until more than seventy days had expired and after the term at which the judgment had been entered had lapsed. The judgment so entered was final, no motion for new trial having been filed or served, nor petition on rehearing filed within the time allowed by statute or rule of this court.

II. No question is made or raised by relator that the items set forth as expenses in the cost bill were not incurred or paid. The only objection urged is that the cost bill was not filed within the time authorized by the statute. Relator had ample opportunity to urge this objection within the time provided for in rule VI of this court, above quoted. The right to object to any item in the cost bill is given, if that right is exercised within the time allowed by the rule. Not having taken his objection within the ten days allowed by rule, and making no showing to excuse his failure in making

his objection in time, we urge that he is estopped to the costs of respondent at this time, or to any item thereof.

III. A court has no power to amend a judgment or order made at a previous term unless a motion to that effect was made, or some proceeding instituted at such term to procure the amendment to be made, and such motion or proceedings were continued. (*DeCastro* v. *Richardson*, 25 Cal. 49; *Jones* v. *Hart*, 60 Mo. 351; *Hastings* v. *Cunningham*, 35 Cal. 549.)

IV. A judgment cannot be corrected and reformed after the term at which it was rendered. (*State, ex rel. Hay* v. *Harper*, 56 Mo. 611; *Sibbald* v. *United States*, 12 Pet. 491; *Bronson* v. *Schulten*, 104 U. S. 416; *Doe* v. *Waterloo M. Co.*, 60 Fed. Rep. 643; *Hoagland* v. *Way*, 35 Neb. 387; *Horner* v. *Horner*, 37 Ill. App. 199; *Pursley* v. *Wickle*, 30 N. E. Rep. 1115.)

V. Relator seeks to do indirectly what he cannot do directly—attack the correctness of the judgment as entered by the clerk. No motion to correct or modify the judgment as entered was made within the time provided by statute, or rule of this court, and he cannot now be heard to complain about respondent's costs, or any item thereof, as set forth in the verified cost bill filed with the clerk on July 25, 1899, a copy of which was served on counsel for respondent on the same day. His objection to the costs, if he intended to rely upon such objection, should have been made in proper form before they were entered in the judgment by the clerk. "When regularly entered up in a judgment, the costs become as much a part of the judgment as anything else contained therein, and their amount and justice are no more subject to collateral attack." (*State* v. *Comrs. Lander Co.*, 22 Nev. 71.)

*Per Curiam:*

At the general election of 1898, the relator, the respondent, George Russell, and J. B. McCullough were candidates for the office of governor of the State of Nevada. By the official canvass it appeared that the respondent received 3,570 votes, the relator 3,548 votes, and each of the other candidates a lesser number than the relator. The respondent was declared duly elected to the said office for the term of four years from the first Monday in January, 1899. A commission was duly issued to him accordingly, and upon said last-named date he

duly qualified and entered upon the discharge of the duties of said office.

This proceeding is brought to oust the respondent from said office, and to instate the relator therein.   The relator, by his complaint, alleges that on the 2d day of January, 1899, the respondent usurped, intruded into, and ever since and now unlawfully holds, the office of governor of the State of Nevada, and ever since has, and now withholds the said office from relator.   He alleges that the relator received the highest number of the legal ballots cast for said office, and was duly elected thereto, and that a great number of ballots were cast and counted for the respondent which were illegal and void, on certain grounds named, which should have been, and should now be, rejected from the count of votes cast for governor, and that, if they be excluded therefrom, the true result of the election will be found to be in favor of the relator.

It is due the able array of counsel of the respective parties to state that they have exhibited remarkable industry in presenting the facts, and in compiling the authorities in support of their several contentions on the legal points involved, and have maintained their positions on both questions of law and fact with great clearness and ability.   To give in full the questions raised, and note the argument of counsel and the authorities cited, would doubtless fill a volume of the Nevada Reports.

In the preparation of the final opinion the members of the court have endeavored to state as plainly and concisely as they could the more important legal questions presented, and the rulings thereon made during the progress of the trial, as well as those reserved for determination till the close, with brief citations of authorities, and mainly without elaboration.   For full citation of authorities on the several questions raised and discussed, reference is made to the briefs of the counsel.   The desire of the court has been, throughout the trial, to reach as speedily as possible the final and paramount question in this case, for which of the candidates, the relator or the respondent, were the greater number of legal ballots cast for the office of governor? and from the evidence

obtained by an inspection of the ballots themselves to arrive at a correct conclusion.

*Preliminary Question:* The respondent presented a preliminary question—an objection to the jurisdiction of the court on the ground that the proceeding was not brought by the attorney-general, or in his name. The statute authorizes that officer to bring such action upon his own information, or on the complaint of a private party in the name of the state, against any person he has reason to believe usurps, intrudes into, or unlawfully holds or exercises, any public office or franchise. (Gen. Stats. 3342.) He may, in addition to the statement of the cause of action, set forth in the complaint the name of the person rightly entitled to the office, with a statement of his rights thereto. (Gen. Stats. 3343.) The attorney-general, not believing that the respondent had usurped, intruded into, or was unlawfully holding the office of governor, refused to bring the action. He interposed no objection to the relator bringing the action in the name of the state on his own relation, and the court granted him leave to do so. The constitution vests in this court original jurisdiction in *quo warranto* proceedings. The respondent's objection was overruled, not without the court entertaining doubts as to the correctness of the ruling. To have dismissed the proceeding would have left the relator without an adequate remedy, although by his complaint he showed that he had a right to said office.

"An act relating to elections" (Laws 1873, p. 197) provides for contesting the election of any person declared duly elected to a district, county, or township office, but it contains no valid provision for contesting the election of a person declared elected to a state office. The only remedy a person has, who may be duly elected to a state office, to oust one unlawfully holding the same, and have himself instated, is by proceedings in *quo warranto;* and when the prosecuting officer refuses to institute such proceedings there is no remedy, unless the contestant be permitted to bring the action on his own relation. Evidently the legislature did not intend to deny to any person the right to have his claim to an office adjudicated by the courts in the event of the refusal of the

prosecuting officer to act, when such person's claim is based on such alleged facts as show him to be entitled to the office· By an oversight the legislature has failed to provide for such contingency. Its attention now being called to it, doubtless appropriate legislation will be had, and contestants and courts be relieved from such embarrassment.

*Inspectors and Clerks:* The statute (Laws 1873, p. 197, sec. 2) provides that the inspectors and clerks of election "shall not be appointed from the same political party." The question of the validity of the appointment of inspectors and clerks in Humboldt and Lander counties from the same political parties was raised by respondent's demurrer to the complaint. *Held,* that said provision of the statute is directory, and non-compliance therewith, simply, is not sufficient ground for rejecting the vote of the county or precinct; that it is only those provisions of the election law relating to the time and place of holding elections, the qualifications of voters, and such others as are made essential prerequisites to the validity of an election, that are mandatory; that an honest or mistaken disregard of them, not resulting in fraud, will not justify the rejection of an entire vote of a precinct. (*Russell* v. *McDowell,* 83 Cal. 70, 23 Pac. 183; Paine, Elect. 379; 6 Am. & Eng. Enc. Law, 302; McCrary, Elect.)

Misconduct on the part of the inspectors, electors and bystanders at Paradise and Kennedy precincts in Humboldt county, and at three precincts named in Lander county, at said election, was alleged by the complaint, setting forth specific acts done, such as are prohibited by an act to promote the purity of elections, and by that act made criminal offenses. It was not alleged that the respondent in any manner participated in said acts, or that they were done with his knowledge or consent, or that any elector who desired to vote for the relator was prevented from properly marking his ballot in secret and casting it for him, or that any elector was influenced to vote for respondent on account of any of the alleged acts, or that any elector who voted at either of said precincts participated in any of the said acts. On demurrer to the complaint, held: That said alleged acts are not sufficient grounds for rejecting the vote of any of the said precincts from the canvass of the votes cast for governor.

By the terms of said act to promote the purity of elections, it is provided that the election of a person to office shall not be void, nor shall he be removed from or deprived of his office, by reason of the commission of any of the offenses prohibited by said act, if not committed by him, or with his knowledge or consent. (6 Am. & Eng. Enc. Law, 359, 360; McCrary, Elect. 530; *State* v. *Mason,* 14 La. Ann. 505.) And that it is well settled by authority that any irregularity in conducting an election which does not deprive a legal elector of casting his vote according to law, or admit a disqualified person to vote, or cast uncertainty on the result, and has not been occasioned by the agency of a party whose right to office is in contest, shall not vitiate the election. (*Gass* v. *State,* 34 Ind. 425; Cooley, Const. Lim., 6th ed., 777, and cases cited.)

*The Soldiers' Votes:* It was alleged by the complaint that Troop A, First Nevada Cavalry, in actual service in the United States army without the boundaries of the state, on the 8th day of November, 1898, on board ship on the high seas, between the coast of California and the Hawaiian Islands, who were citizens and electors of this state, held an election and cast their ballots in due form of law, and made due return thereof to the secretary of state; that the board of canvassers, consisting of the governor, chief justice of the state, and the United States district attorney, as provided in the election ordinances of the constitution of this state, and the present state board of canvassers, consisting of the chief justice and one or more of the associate justices, have each failed to open and canvass said soldiers' votes; that said votes, if opened and canvassed, will show 11 votes cast for the respondent and 24 votes cast for relator; and that said votes should be canvassed and counted by the court. *Held,* that said election ordinance applied only to the election held in pursuance of the mandate of congress, found in the enabling act, requiring the constitutional convention to submit for ratification or rejection the constitution to the people of the Territory of Nevada, including those in the army of the United States, both within and beyond the boundaries of the territory; that the provisions of said ordinance do not, and were not intended to, apply to future elections held under the

constitution and state government, but only to the election therein specifically provided for, and to any future election that congress might for any reason order for resubmitting the constitution to the people of the territory, as congress did with reference to a constitution framed by a convention for Kansas a few years before; that there is no statutory provision regulating the manner of voting or holding elections by persons who may be in the military or naval service of the United States, beyond the boundaries of the state, or for making returns of such election; and that without such provisions no such election could be legally held. (Cooley, Const. Lim. 98.)

*The Answer:* The respondent's answer consists of denials and allegations. The question of the validity of 447 ballots cast for relator in Reno was raised. It was most earnestly and elaborately argued by respective counsel, as the decision of the court if against relator's contention, it was doubtless considered, would terminate the proceeding, under a rule adopted in the *Sweeney-Hjul Case,* 23 Nev. 409, 48 Pac. 1036, and 49 Pac. 169. The opinion and rulings of the court on that question were given as follows:

" The respondent has set up in his answer, as an affirmative defense, that at said election there were five election districts duly established in the city of Reno, each district embracing one of the five wards of the city; that the act incorporating the city provided that the electors of each ward should elect one councilman, the five councilmen thus elected to constitute the board of councilmen of said city; that in each ward a certain number of ballots, all of which had printed thereon the names of all the candidates for city councilmen, were cast and counted for the relator, amounting in the aggregate in all the wards to 447 ballots, on which there were crosses and other illegal and distinguishing and identifying marks made opposite the name of the persons named and nominated for councilmen in each of the other wards of the city.

" The relator interposed a general demurrer to that portion of the answer, and asked the court to decide the question of the validity of the ballots cast in the respective wards by voters who voted for councilmen who resided in, and were

candidates for the office of councilman for, a ward other than that in which the voter resided or was entitled to vote, irrespective of the allegations that said ballots contained other distinguishing and identifying marks. It is claimed by the relator that, under the act incorporating the city of Reno (Stats. 1897, p. 50), each elector of the city had a right to vote for all five of the city councilmen. Upon this question the court is of one mind. By section 3 of said act it is provided that the corporate powers of the city shall be vested in a city council, to consist of five members, who shall be actual residents and owners of real estate in the city, who shall be chosen by the qualified electors thereof, provided that no two or more of said five councilmen shall be residents of the same ward. If this section stood alone, without further enactment limiting or restricting in any manner its provisions, then would the claim of the relator be tenable; but it is further provided by section 5 of said act that at the general election in November, 1898, and at each general election thereafter, there shall be elected one councilman in each ward, who shall be a resident of such ward, and an owner of real estate in the city, who shall hold office for the term of two years, and until their several successors are elected and qualified.

"The further provision of said section relates to the manner of filling any vacancy that may occur in the board, and the time the councilmen so elected shall enter upon the discharge of their duties. It cannot be said or urged with any reason that the legislature did or intended to do an unnecessary thing by the enactment of section 5 of said act, yet, if relator's contention is true, then it was unnecessary to provide that there should be elected 'one councilman in each ward who shall be a resident of such ward,' as section 3 practically made provision for the same. If the legislature did not intend what is said in express terms, then it did an unnecessary thing, and the requirements of section 5 would have been complete by the simple provision for the election of five councilmen at the general election of 1898, and at each general election thereafter, to hold office for a term of two years, and until their successors are elected and qualified. This is the construction we are asked to put upon this section, and, in order so to do, must eliminate language deliberately

incorporated in the statute by the legislature, that would give it a meaning different from the one claimed.

"It is not our duty to legislate, or to destroy legislative intention, except for constitutional reasons, under well-established rules. It is our duty to construe laws and give effect to legislative intention. Under well-settled rules of construction (so well settled as not to require citation of authorities), to the effect that the courts will look into the statutes themselves (the language used by the lawmakers in the statutes), and, in order to give effect to all the provisions of the statutes, will consider the various sections thereof together, the question becomes plain and simple. Under these rules the councilmen of the city of Reno were to be chosen by the electors of the city—each councilman by the electors of his ward. In other words section 3 provides for the election of the city councilmen of the city, and section 5 provides for the manner of their election, etc. The language used in our constitution presents almost an exactly parallel case, from which the same claim could as reasonably be made, and yet no one would pretend to make such a claim. Section 1 of article 2, providing how and by whom the elective franchise may be enjoyed, declares that every male citizen of the United States, not laboring under disabilities named in the constitution, of the age of twenty-one years and upwards, who shall have actually, and not constructively, resided in the state six months, and in the district or county thirty days, next preceding any election, 'shall be entitled to vote for all officers that now are or hereafter may be elected by the people, and upon all questions submitted to the electors at such election.'

"The right to vote for all officers, from governor to and including all assemblymen and state senators, could not be given in stronger or broader language, and, standing alone, such right might reasonably be claimed by the elector; yet no one claims to exercise the right, because, by subsequent sections, in a different article, provision is made for the election of senators and assemblymen in their respective districts. The assertion of any such right by the individual elector could be maintained only by ignoring and utterly disregarding the subsequent sections regulating and governing the

election of senators and assemblymen in their respective districts.   The same may be said of section 3, incorporating the city of Reno.   If each elector of the city has the right to vote for all the five councilmen to be elected therein, then must we disregard the express provision of section 5 of the same act.   It has also been claimed that a councilman, under the law, has no exclusive power or authority in his own ward.   Here, again, the analogy between the statute and constitution is apparent.   Neither has the assemblyman or senator, by constitution or law, any exclusive power or authority in his county or district.

"We come now to the more serious and important question, involving the application of the rule laid down in *Sweeney* v. *Hjul* to the facts alleged in respondent's 'answer.   We fully realize the importance and effect of that rule, and the strength of the reason upon which it is based, under the Australian ballot law, as applying to the individual elector and the individual ballot; yet a case has arisen under the construction of that act which could never have been contemplated by the legislature in its passage, and the strict construction of which would operate to disfranchise a large per cent of the voters of the state living in the same county, and by the same strictness of construction would, upon a more careful examination of the act, exclude the ballots of any precinct or county which might through the fault of the officers have printed thereon names of officers for whom the elector had no right to vote in such precinct or county.

"The right of the single elector may be and is just as sacred as the rights of the many, under our constitution; yet where a construction of the law is likely to disfranchise a large number of the electors in a case, arising through the mixed fault of the officers and voters in preparing and casting ballots in a precinct or county, in which reason almost conclusively suggests that there was neither fraud nor corruption on the part of either, there being no showing, by averment or otherwise, outside the ballots, of such fraud or corruption, and which never could have been contemplated · by the legislature in the passage of the act, the language of which must be construed by the court in order to give it a just and reasonable effect and harmonize it with constitu-

tional rights, and that much-desired purity of election intended by its passage, and where it is apparent that any modification of the construction of such act heretofore given cannot be made in the interest of many, under the above showing, without injury to the individual and his rights, then justice demands that the rule and construction be abrogated, in the interest of all, and the settlement of the matter be left to the legislative department to provide in express and certain terms, having regard for the constitution, plain and simple rules that shall govern in all such cases.

"For these reasons a majority of the court deem it proper to overrule that part of the decision in *Sweeney* v. *Hjul* applicable to the facts shown by that part of the answer under consideration, and sustain the relator's demurrer thereto. This conclusion has been reached after deliberate and careful consideration and discussion, and not without some doubt, and is based in part upon the rule that public interest in matters of this kind will be best subserved by giving a law of doubtful meaning the construction that will result in the least wrong and injustice."

*The Election in Storey County:* For further answer the respondent alleged, in substance, that on the 3d day of November, 1896, F. C. Lord was duly elected state senator for Storey county for the term of four years from and after the 4th day of said November, and subsequently duly entered upon the discharge of the duties of his office; that thereafter, on the 8th day of July, 1898, he was duly appointed paymaster in the army of the United States (a lucrative office), with the rank of major; that on the ____ day of October, 1898, J. A. Conboie was nominated as a candidate for state senator by petition filed with the county clerk of said county, to fill the unexpired term for which Lord had been elected; that at said last-named date there was no vacancy in the office, and the governor of Nevada had not by proclamation called an election to fill any such vacancy; that the name of J. A. Conboie was printed on the ballots distributed and used in all the precincts in said county at said election; that there were 595 ballots cast and counted for relator for said office of governor with the name of said J. A. Conboie printed thereon as a candidate for state senator, and with a cross opposite his

name on each ballot. It was alleged that said ballots, by reason of the above alleged facts, were illegal and void, and should not have been, and should not now be, counted for the relator.

The constitution provides: "No person holding any lucrative office under the government of the United States, or any other power, shall be eligible to any civil office of profit under this state." (Article IV, sec. 9.) It was admitted in argument on demurrer to the above portion of the answer that F. C. Lord accepted said appointment and entered upon the duties of the office. *Held*, that, by reason of the acceptance of said appointment, he became incapable of legally holding the office of state senator; that the acceptance of the federal office was a resignation of the state office, and created a vacancy in the latter office. (*State* v. *Clarke*, 3 Nev. 570; *State* v. *Clarke*, 21 Nev. 333, 31 Pac. 545; McCrary, Elect., 3d ed., sec. 301; *People* v. *Carrique*, 2 Hill, 93; *People* v. *Leonard*, 73 Cal. 230, 14 Pac. 853.) It was contended by counsel, upon the authority of the California cases, that a special election must be held to supply a vacancy occuring before the expiration of a full term in office, and that the proclamation of the governor is necessary to the validity of a special election. No such proclamation was issued with respect to any vacancy in the said office of state senator.

Section 1668, Gen. Stats., provides: "When any vacancy shall occur in the office of a member of the senate or assembly by death, resignation or otherwise, and a session of the legislature is to take place before the next general election, the governor shall issue a writ of election  *  *  *  to fill such vacancy." *Held*, that no proclamation or writ of election was necessary to enable the people of said county to legally fill said vacancy at said election, as there was no session of the legislature to take place between the date of the occurrence of said vacancy and the next general election. It was argued that voters are not presumed to know that an officer has resigned or died, and that one of the functions of the governor's proclamation is to give notice of the fact of a vacancy. But F. C. Lord was a prominent citizen of Storey county, and well known to the people, and for several years prior and up to said appointment was the duly commissioned

and acting colonel of the Nevada National Guard. His appointment to and acceptance of said office of paymaster were of great public notoriety, and the people of Storey county were as well advised of these facts, and that a vacancy existed in the said office of state senator, as the governor or any other person. *Held*, that said election for state senator was a valid election, and that none of the 595 ballots cast as aforesaid should be rejected in the count for relator by reason of being so cast, or because of a cross being made thereon opposite the name of J. A. Conboie.

*Registration*: It is alleged by the answer that in the city and township of Reno there were more than 300 names of persons illegally placed on the register of voters by parties other than the registry agent, and that more than 200 of these persons thus illegally registered cast their ballots for the relator, and that said ballots were canvassed and counted for him. It is contended by counsel for respondent, as we understand, that the votes of these persons should be excluded from the count in this case, or, if that be impracticable, that the election held in Reno be declared void, so far as the governorship is concerned. It is not alleged, nor was it attempted to be shown, that said 300 persons, or any of them, were not duly qualified electors, by reason of the want of any of the electoral qualifications prescribed by the constitution.

The evidence as to said registration is that the registry agent, by reason of being sick for 10 or 12 days immediately preceding the statutory time for closing the registration, was unable to attend to the registration of the voters, and he requested W. D. McNeilly, the constable, who had his office in the room with the registry agent, to take the names of persons applying for registration in his absence, and enter them on the official register. Subsequently the registry agent certified the names of all of these persons to the inspectors of election in the several wards of Reno, with the names of the persons he had registered himself. Most of these persons, if not all, voted at said election. McNeilly testified that he registered no one about whose right to registration he had any doubt; that he consulted the district attorney and the chairman of the board of county commis-

sioners, and they advised him to go ahead and register the voters. Although there is no evidence tending to show bad faith on the part of any one, 'and we are of the opinion that all connected with said registration acted in good faith, yet such registration was without authority of law. The provisions of the registration law for ascertaining whether the applicant for registration is legally entitled thereto should be strictly followed. This was not done in the registration in question. Besides, no one is legally authorized to register voters, except justices of the peace and other persons duly appointed and qualified as provided by statute for that purpose.

While the statute provides for filling a vacancy occasioned by death or resignation of the registry agent, there is no provision for the registration of voters in case of any other disability of the agent. By section 14 of the registry law, the fact that the name of a person offering to vote appears in the check list and copy of the official register furnished the inspectors by the regular registry agent is *prima facie* evidence of such person's right to vote. The inspectors have no right to refuse to receive his vote, except upon his failure to prove his identity as the person who was registered in that name, when required to do so under the provision of said section. "They are only ministerial officers in such a case, and have no discretion but to obey the law and receive the vote." (Cooley, Const. Lim. 617; *Wolcott* v. *Holcomb*, 97 Mich. 361, 56 N. W. 837.)

Under the above facts and circumstances, we are of the opinion that the ballots of the said persons so registered should not be rejected on account of said irregular or illegal registration.

*Non-Resident Voters:* It is alleged by the complaint that several persons named voted for the respondent at certain precincts who were not residents of the county, and like allegations are made by the answer with respect to persons who voted for the relator, but neither party produced any evidence to sustain such allegations. It is alleged by the complaint that in certain precincts in Lander county some 20 or more persons named voted for respondent who were not residents of the precinct, but residents of other precincts in

the county, and similar allegations are made with respect to certain persons having voted for respondent in Nye, Eureka, and Humboldt counties, precincts other than that of their residence. The answer contains like allegations with respect to persons who voted for the relator in several counties. As to the residence required as a condition to the right of voting, the constitution provides that 6 months' actual residence in the state, and 30 days' in the district or county, next preceding any election, shall entitle every person to vote for all officers to be elected by the people.

The statute makes it the duty of the county commissioners to establish election precincts and define the boundaries thereof, but if there be an election precinct established in any county, with the boundaries so defined that the courts or the electors may determine the territorial extent of the precinct, it has not been shown in this case. In a county where there are no election precincts properly established and bounded, an elector of the county, properly registered by any registry agent therein, can legally take the certificate prescribed by section 10 of the registration law, which will entitle him to have his name registered at any other polling place in the same county at any time before the delivery of the certified copy of the register to the inspectors of the election, and when so registered he will be entitled to vote at such polling place.

*Errors of Inspectors:* It is alleged by relator, in substance, that in certain precincts of the several counties legal ballots were cast for him, but not counted by the inspectors; that in certain precincts a certain number of ballots, amounting in the aggregate to several hundred, which contained distinguishing and identifying marks, such as to render them void, were cast and counted for the respondent. By the answer it is likewise alleged that a certain number of legal ballots in certain precincts were cast for respondent, but not counted for him, and that in certain precincts and counties a great number of illegal and void ballots, by reason of distinguishing and identifying marks made thereon, were cast and counted for the relator. In support of these allegations, respectively, the parties offered in evidence the ballots. In nearly every instance when the ballots were offered from a

county or precinct, an objection to their introduction was made by the other party, on several grounds.

The ballots were produced in court by the present county clerks, whose testimony is clearly sufficient to show that the ballots were properly cared for after coming into their possession, but in most cases the ballots were shown to have been in the custody of other officers before being received by the clerks. These other officers were not present, and their testimony was not taken. The ballots were admitted under the objection; the court reserving the consideration of the objections until its examination of the ballots themselves, the official returns of the inspectors, and the ballots returned as rejected by them. From such examination it clearly appears that there was no marking of or tampering with any of the ballots after leaving the hands of the voters that impeaches their validity. All of the objections to the introduction of the ballots in evidence are overruled.

*The Ballots:* The relator and the respondent, by their respective counsel, examined all the ballots cast in the state, in open court, except from four precincts, in which the official returns show that 60 votes were cast for relator and 100 for the respondent; and each party objected to certain ballots on the alleged grounds that they contained distinguishing and identifying marks, and by reason thereof were void, and should not have been counted by the inspectors, and should not be counted by the court. The relator objected to 564 ballots cast for respondent, and the respondent objected to 593 ballots cast for the relator. There were 6,018 ballots cast for the two candidates to which no objection was made by either party. Of these ballots the relator received 2,979, and the respondent 3,039. Of the ballots cast for respondent, and counted for him by the inspectors, to which the relator objected on the ground that they contained illegal, identifying, and distinguishing marks, the court rejected 135, upon the ground specified.

Of the ballots cast for relator, and counted for him by the inspectors, to which the respondent objected on the same ground, not including the so-called red-line ballots, the court rejected 119. Deducting the 135 ballots from 3,570 counted for respondent as shown by the official returns leaves him

3,435 votes. Deducting the 119 ballots from 3,548 counted for the relator as shown by said returns leaves him 3,429 votes. The inspectors rejected in the aggregate 5 legal ballots cast for the relator, and by errors otherwise in the counts made his vote 6 less in the aggregate than he properly received. In one precinct 2 more votes were counted than were cast for him. The relator's net gains are 9 votes. The inspectors rejected in the aggregate 12 legal ballots cast for the respondent, and by errors otherwise in the count made his vote 2 less than he received, and by like errors in other precincts he was given 3 more votes in the aggregate than were cast for him. The respondent's net gains are 11 votes. To the above number of votes cast for the relator we add his said net gain, making his total vote 3,438. To the above number of votes cast for the respondent we add his said net gain, making his total vote 3,446—a majority over the relator of 8 votes, not considering the 55 red-line ballots cast for the relator, which, as will be seen below, the court rejected on the grounds therein given.

*Objections:* We come now to the consideration of the objections made to the ballots offered by the respective parties. The necessarily hasty examination of a part of the relator's objections to ballots, made during a temporary adjournment of court, and without a copy of the reporter's notes, resulted, as we anticipated, in some mistakes in overlooking objections made, to which counsel on both sides subsequently called our attention. We have again examined all the ballots, and carefully noted the objections taken thereto, as shown by the copy of the reporter's notes, and have endeavored to correct any such errors—errors mainly due to rulings upon objections to ballots which had been rejected by the election officers, and in some cases where the markings rendering the ballots void were, from their position and character, not easily detected during the hasty examination given. It is sufficient to say that, in the absence of any averment or proof of fraud or corruption on the part of any person at the election, we have considered the constitutional right of the electors, as well as the rights of the relator and respondent, in all the rulings upon objections to the separate ballot, and have held ballots good and valid in all instances

where such ruling was not in violation of the spirit and strict letter of the law, and have thereby followed the rulings of this court in the earlier cases coming under the provisions of that law.

We have also taken into consideration the fact that the markings required to be made by the elector as indicating his choice of candidates must be made by pencil, by as many different persons as there were ballots cast; that there were electors of different ages, conditions of health, and of different experience in the use of pencils. We have also taken into consideration the place required by law where the markings were made. We have also considered the fact that the law does not, and could not possibly, specify the size, the length of the lines composing the cross, or the angle at which these lines should cross each other, that no two persons make the same kind or character of a cross with a pencil, and that it is a rare occurrence that the same person makes the same kind or character of a cross with the same pencil under the conditions imposed.

We have therefore overruled objections to the validity of ballots based upon the following alleged bad markings: In all cases where the elector had attempted to make the cross, and had actually made the so-called letters "Y," "T," inverted "T," "V," inverted "V"; also, where the cross made resembles the figure "4"; also, the so-called double crosses, where it is apparent the voter had attempted to retrace the lines composing the cross; also, crosses made by curved or irregular lines, evidently the result of nervousness or physical infirmity, or the roughness of the boards upon which the ballot was placed for marking; also, accidental pencil markings; also, ink blotches, evidently the result of accident on the part of the election officers; also, dirty finger marks; also, crosses indiscriminately appearing upon the face of the ballots, where it is evident such crosses were simply the impressions of crosses made in the proper places upon the ballots with a soft lead pencil, and such impressions were made by the folding of the ballots (of this class there were a very large number of ballots); also, ballots with words written thereon in pencil or ink, where it is apparent from the position of the words upon the ballot, the import of the words themselves,

and the character of the writing, that the same was done by
the election officers after the ballot had been marked and
cast by the voter; also, ballots marked with large and heavy
crosses in proper place; also, accidental pencil dots and fine
and irregular pencil marks; also, slight attempted erasure of
crosses made by the bare finger; also, crosses found upon the
back of the ballots, where it is apparent that the same were
made from the impression of the pencil in the attempt of the
voter to properly mark his ballot resting upon a stained or
dirty board; also, some of the so-called stars, evidently the
result of an attempt to retrace the lines composing a cross, or
an attempt to retrace such lines by one with a nervous hand,
or upon rough boards; also, crosses made with a slight hook
at one or the other end of the lines forming them.

Many objections were also made to ballots based upon the
form and irregularity of the crosses, which we do not deem it
necessary to specifically name.

Objections to ballots which have been sustained are in the
main based upon the following kind or character of marks:
Ballots with horizontal lines thereon; ballots marked with a
capital "W," and a horizontal line crossing the same; ballots
in some instances marked with a perpendicular or vertical
line; ballots marked with a circular loop; ballots marked
with crosses, and the same erased or scratched out with a lead
pencil; ballots with erasures sufficient to deface and destroy
the texture of the paper; ballots with words written thereon,
in all cases where it is apparent that the words were written
by the elector, or by some other person unauthorized, before
the same were cast by the elector; ballots with crosses on the
margin thereof, and not after the names of candidates to
be voted for; a ballot with the letter "D" of "A. D.," in the
official heading thereof, scratched over deliberately with a
lead pencil; ballots marked with crosses not after the names
of any candidates to be voted for, but placed after the desig-
nation of the office; ballots with crosses placed immediately
between the printed names of the candidates; some ballots
marked with stars and with marks resembling spiders; bal-
lots with the cross and also a figure "1" placed thereafter;
ballots where the elector had voted for the proper number of

candidates for some office, and had also placed an additional cross in the proper place after the blank space left for the writing in of the name of any candidate nominated to fill a vacancy; ballots where the elector had scratched off with a pencil words or names printed thereon; ballots where two crosses are made after the name of a candidate voted for; ballots marked with a cross in proper place, and inclosed with the letter "O," or circular lead pencil mark; a ballot bearing no cross, but with a perpendicular pencil mark in proper place after the names of all the candidates intended to be voted for; ballot with the letter "S," and a vertical line drawn through the same; ballots with the crosses placed immediately to the left of the names of the candidates voted for; ballots with equation marks between the printed names of the candidates and the party designation; ballots marked with two vertical lines not forming a cross (ballots whereon the voter had voted for more candidates for the same office than were to be elected were not held to be void, but such ballots, where the elector had attempted to vote, or had voted, for the relator and the respondent, or for the relator or respondent, and some one of the other candidates for governor, were not counted for either relator or respondent or other candidate for governor); ballots marked with the letter "N," and a horizontal line drawn across the same; a ballot with a cross in the letter "O" of the printed word "Official"; ballots marked with a blue or purple pencil; ballots marked with ink; ballots marked with the ordinary business check mark; ballots with the cross between the name of the officer to be elected and the instruction "Vote for One," etc.

Ballots with the crosses directly on the line between the candidates for governor, and in such a position as to prevent the court from determining for what candidate the same were intended to be cast, have not been held to be void, but such ballots have not been counted for the office of governor, and other ballots bearing marks the character of which renders it impossible to describe. We deem it necessary to say here that under the law we have held as valid and counted all ballots having a proper cross, not in the square prepared thereon in printing, but after and to the right of the names

of the candidates voted for. Accordingly specific objections to the various ballots marked as exhibits and filed in the action have been sustained as follows:

In Nye county, Union Canyon precinct, relator's Exhibit No. 1; in Currant Creek precinct, relator's Exhibit No. 3; Tybo precinct, respondent's Exhibit No. 4.

Lyon county, Wabuska precinct, relator's Exhibit No. 1; Dayton precinct, relator's Exhibits Nos. 6, 8, 12, 15, and 16; respondent's Exhibits Nos. 8, 9, 10, 13, 14, and 16; Silver City precinct, relator's Exhibit No. 1 and respondent's Exhibit No. 1; Mason Valley precinct, relator's Exhibits Nos. 1, 2, 3, 4, 7, 8, 9, 10, and 11; respondent's Exhibits Nos. 1, 2, 3, 5, 7, and 8; Sutro precinct, relator's Exhibits Nos. 1 and 2. In Plummer precinct, Lyon county, objections to relator's Exhibit No. 1 are sustained, and objections to respondent's Exhibit No. 1 are also sustained.

Lincoln county, Delamar precinct, relator's Exhibits Nos. 2, 31, 33, and 34. In the same precinct, relator's Exhibit No. 16 is a ballot objected to because the cross is immediately on the line between the names of Sadler and Russell. Relator's Exhibit No. 9 is a ballot objected to for the reason that the elector had voted for both the respondent and McCullough for governor. The official returns show that the board of inspectors did not count either of these ballots for the respondent, and it is therefore unnecessary to pass upon the same, or consider them as a part of the final result. In the same precinct objections to respondent's Exhibit No. 1 were sustained. In Pioche precinct objections to relator's Exhibits Nos. 1, 3, and 4 are sustained, and objections to respondent's Exhibits Nos. 1 and 2 are sustained. In this precinct 1 ballot was voted for both the respondent and relator, but the same was not counted in the official returns. In Mesquite precinct objections to relator's Exhibit No. 1 are sustained. In Hiko precinct objection to relator's Exhibit No. 2 is sustained. In Deer Lodge precinct objection to respondent's Exhibit No. 1 is sustained. In Searchlight precinct objections to relator's Exhibits Nos. 1 to 10, inclusive, are sustained. In Panaca precinct objections to relator's Exhibit No. 1 are sustained.

Eureka county, Eureka precinct No. 1, objections to relator's

Exhibits Nos. 2, 10, 12, 25, 35, 38, 41, and 49 are sustained. The count made by the court in this precinct corresponds with the official returns, without considering the ballot voted for both respondent and relator, to which objection was made by both parties. In Palisade precinct, relator's Exhibit No. 2, a ballot voted for both McCullough and the respondent, was not counted in the official returns, and is not counted by the court. In Ruby Hill precinct the count made by the court shows a gain of 1 vote for the relator over the official returns. In Beowawe precinct objections to relator's Exhibits Nos. 2 and 4 are sustained. The count of this precinct made by the court shows that the respondent gains one vote, but, as it is evident that relator's No. 2 was not counted by the board of inspectors, sustaining the objections thereto in no manner changes the returns as officially made.

In Lander county, Austin precinct No. 1, relator's Exhibit No. 16, a ballot voted for the respondent and rejected by the board of inspectors, is a good and valid ballot, and should have been counted for the respondent. In the same precinct relator's No. 17 is also a ballot voted for the respondent and rejected by the board of inspectors, but should have been counted, and is by the court counted for him. By reason of the above errors, the respondent gains 2 votes in this precinct. In Dean precinct, relator's Exhibit No. 3, voted for both Sadler and Russell, was counted by the board for the respondent, but should have been rejected. In Austin precinct No. 2, objections to relator's Exhibits Nos. 6, 8, and 11 are sustained. In the same precinct objections to respondent's Exhibit No. 4 are sustained.

In White Pine county, Aurum precinct, objections to relator's Exhibit No. 1 are sustained. In Osceola precinct objections to relator's Exhibit No. 1 are sustained. The official returns of said precinct show that this exhibit was not counted by the board of inspectors, and sustaining the objections thereto makes no change in the official returns. In Ely precinct of the same county 140 electors cast their ballots. There were found in the returns of this precinct 3 blank ballots marked " Rejected " by the officers, 2 of which have the strip containing the number on the right-hand side. One of the 3 ballots voted for Russell was evidently and

clearly rejected by the board because the crosses were made to the left of the names of the candidates. Two ballots were also found among the returns marked "Spoiled" by the inspectors. Four other ballots were found among the returns marked "Rejected." One of these last was offered by the relator, and objected to because the strip containing the number remained on the right-hand side thereof. As this ballot was evidently cast without the strip being detached, under the former rulings of this court the objection is not well taken, and the ballot should be counted for the relator. In the same precinct objections to relator's Exhibits Nos. 2, 3 and 4, which were of the rejected ballots cast for respondent, and for the same reasons, should be counted for the respondent. Under these rulings the relator gains 1 vote, and the respondent 3 votes, in this precinct. In Hamilton precinct of the same county, objections to respondent's Exhibits Nos. 1 and 3 are sustained. The respondent loses 1 vote in this precinct, as shown by the count made by the court. In Cherry Creek precinct of the same county, objections to relator's Exhibits Nos. 1 and 3 are sustained. Objections to relator's Exhibit No. 5, which is a ballot voted for the respondent and rejected by the board of inspectors, are overruled, and this ballot counted for the respondent. Objections to relator's Exhibit No. 8, which is a ballot voted for the respondent and rejected by the board of inspectors, are overruled, and this ballot should be counted for the respondent. Objections to relator's No. 9, another ballot rejected by the board of inspectors and voted for the respondent, are overruled, and this ballot counted for the respondent. By these rulings the respondent gains 3 votes in this precinct. In White River precinct of the same county, objections to relator's Exhibit No. 1 are sustained.

In Elko county, Lamoille precinct, objections to relator's Exhibits Nos. 1, 6 and 11 are sustained. In Ruby Valley precinct of the same county objections to respondent's Exhibit No. 3 are sustained. In North Fork precinct of the same county the count made by the court shows a loss of 1 vote for the respondent. In Tuscarora precinct objections to relator's Exhibit No. 18, a ballot cast for the respondent and rejected by the board of inspectors, and overlooked by

the court in the former examination of the ballots, are over-
ruled, and the ballot counted for the respondent. In the
same precinct objections to respondent's Exhibits Nos. 21, 22
and 23, which are ballots cast for the relator and rejected by
the board of inspectors, objections to 2 of which ballots
were overlooked by the court in its former examination, are
overruled, and these ballots are counted for the relator. By
these rulings the respondent gains 1 vote, and the relator
3 votes, over the official count in this precinct. In North
Ruby precinct of the same county objections to relator's
Exhibits Nos. 2 and 3 are sustained. In the same precinct
objections to respondent's Exhibit No. 5 are sustained. In
Elko precinct respondent's objections to Exhibit No. 17, a
ballot cast for the relator and rejected by the board of
inspectors, are overruled, and the ballot counted for the
relator. By this ruling the relator gains 1 vote over the
official count in this precinct. In Halleck Station precinct
of said county objections to relators Exhibits Nos. 1, 4, 7, 9,
11, 12, 13, 14 and 15 are sustained. In the same precinct
the count by the court shows a gain of 1 vote in favor of the
respondent over the official returns. This difference may be
accounted for from the fact that relator's No. 6 (a Sadler
ballot) was not counted by the board of inspectors, and is
counted by the court. In either event the respondent gains
1 vote in the count. In Wells precinct of said county
objections to respondent's Nos. 1 and 10 are sustained. In
Toano precinct of said county objections to respondent's
Exhibits Nos. 1, 2, 3 and 5 are sustained. In Tecoma pre-
cinct of said county objections to relator's Exhibits Nos. 1 to
4, inclusive, are sustained. In the same precinct objections
to respondent's Exhibits Nos. 1 to 6, inclusive, are sustained.

In Humboldt county, Lovelock precinct, objections to
respondent's Exhibits Nos. 16 and 19 are sustained. In Ken-
nedy . precinct of the same county objections to relator's
Exhibit No. 1 are sustained. Objections to relator's Exhibit
No. 7, which is a ballot cast for the respondent and rejected
by the inspectors, are overruled, and this ballot counted for
the respondent. By this ruling the respondent gains 1 vote
over the official count in this precinct. In Winnemucca pre-
cinct of said county objections to relator's Exhibits Nos. 4

and 12 are sustained. In the same precinct objections to respondent's Exhibits Nos. 9, 12, and 16 are sustained. In Mill City precinct of said county objections to relator's Exhibit No. 1 are sustained. In Unionville precinct of the same county objections to relator's Exhibit No. 1 are sustained. In McDermitt precinct of the same county objections to relator's Exhibit No. 1, a ballot cast for the respondent and rejected by the board of inspectors, are overruled, and this ballot counted for the respondent. In Golconda precinct of the same county objections to respondent's Exhibit No. 3 are sustained. In Sulphur Mine precinct of the same county objections to respondent's Exhibit No. 1 are sustained.

In Churchill county, Stillwater precinct, objections to respondent's Exhibit No. 1 are sustained. In New River precinct of the same county objections to respondent's Exhibit No. 2 are sustained.

In Esmeralda county, Hawthorne precinct, objections to relator's Exhibits Nos. 2 and 3 are sustained. In the same precinct objections to respondent's Exhibit No. 3 are sustained. In Pine Grove precinct of the same county objections to respondent's Exhibit No. 1 are sustained. In Aurora precinct of the same county objections to respondent's Exhibit No. 1 are sustained. In Douglas precinct of said county objections to relator's Exhibit No. 9 are sustained. In the same precinct objections to respondent's Exhibit No. 1 are sustained. By sustaining the objections to the last-named exhibit, the returns correspond with the official count, and it is probable that this ballot was not counted by the inspectors for either candidate for governor. In Candelaria precinct of the same county objections to relator's Exhibits Nos. 2 and 3 are sustained.

In Douglas county, Genoa precinct, objections to relator's Exhibit No. 1 are sustained. In the same precinct objections to respondent's Exhibits Nos. 1, 2, 3, 4, 5 and 6 are sustained. In Mottsville precinct of the same county objections to relator's Exhibit No. 1 are sustained, and objections to respondent's Exhibit No. 1 are sustained. In Cave Rock precinct of the same county objections to respondent's Exhibit No. 2 are sustained. In East Fork or Gardnerville precinct of the same county objections to relator's Exhibits

Nos. 3, 4, 5 and 6 are sustained, and in the same precinct objections to respondent's Exhibits Nos. 1, 2 and 4 are sustained. In Jack's Valley precinct of the same county objections to relator's Exhibit No. 1 are sustained, and the objections to respondent's Exhibit No. 1 are also sustained.

In Ormsby county, First ward of Carson City, objections to relator's Exhibits Nos. 1, 2, 3, 6, 9 and 10 are sustained. In the same precinct objections to respondent's Exhibit No. 3 are sustained. In the Second ward of Carson City objections to relators Exhibits Nos. 1, 3, 4, 5, 6, 7, 9, 11 and 12 are sustained. In the same ward objections to respondent's Exhibits Nos. 2, 3, 4, 5, 11 and 12 are sustained. In Empire precinct of the same county objections to relator's Exhibits Nos. 1 and 2 are sustained.

In Washoe county, Wadsworth precinct, objections to respondent's Exhibits Nos. 2, 11, 12, and 18 are sustained. In this precinct, also, the count made by the court shows a loss of 1 vote by the respondent. In Huffaker's precinct of the same county, objections to respondent's Exhibit No. 2 are sustained. In Verdi precinct of the same county, objections to relator's Exhibit No. 2 are sustained. In the same precinct objections to respondent's Exhibit No. 1 are sustained. In the First ward of Reno, of said county, objections to respondent's Exhibits Nos. 2 and 4 are sustained. In this ward the count made by the court shows a gain of 2 votes over the official count for the relator. In the Third ward of Reno, same county, objections to relator's Exhibits Nos. 2, 3, 4, and 6 are sustained. In the same ward objections to respondent's Exhibits Nos. 8, 9, and 10 are sustained. In the Fourth ward of Reno objections to respondent's Exhibits Nos. 5 and 9 are sustained. In the Fifth ward of Reno objections to relator's Exhibit No. 2 are sustained. In the same ward objections to respondent's Exhibits Nos. 3, 4, 5, and 9 are sustained. By the count made by the court the relator also loses 2 votes in this ward.

In Storey county, First ward, Virginia City, objections to relator's Exhibits Nos. 1, 2, 3, 4, 5, 6, 10, 11, and 12 are sustained. In the same ward objections to respondent's Exhibits Nos. 1, 6, 10, 14, 15, 16, 18, and 19 are sustained. In the same ward relator's Exhibit No. 13, a ballot voted for the

respondent and rejected by the board of inspectors, should be counted for the respondent. In the Second ward of Virginia City objections to relator's Exhibits Nos. 2, 3, 5, and 6 are sustained. In the same ward objections to respondent's Exhibits Nos. 2, 3, 5, 7, 8, 9, and 10 are sustained. In this ward both the relator and the respondent gain 1 vote over the official count. In the Third ward of Virginia City objections to the relator's Exhibit No. 6 are sustained. In the same ward objections to respondent's Exhibits Nos. 1, 2, 7, 9, 10, 11, 12, 17, 19, and 23 are sustained. In the Fourth ward of Virginia City objections to relator's Exhibits Nos. 1 and 2 are sustained. In the same ward objections to respondent's Exhibits Nos 1, 4, 6, 7, and 8 are sustained. In Gold Hill precinct of the same county objections to relator's Exhibits Nos. 1, 2, and 5 are sustained. In the same precinct objections to respondent's Exhibits Nos. 34, 55, 60, 63, and 64 are sustained.

The consideration of the objections made to the so-called red-line ballots cast in Gold Hill precinct of this county presents in many respects a new question—one differing in important points from any other question heretofore considered and determined by this court in any of the cases arising under our Australian ballot or election law. The facts, briefly stated, are that one H. J. Maguire was duly nominated by petition as an independent candidate for member of the assembly from Storey county. The republican and silver parties had also nominated candidates for the full representation of that county for the same office. The duly certified list of candidates for office, including the name of Maguire, had been published in the newspaper as required by law. The official ballots, printed upon the official ballot paper furnished by the secretary of state, had been printed, upon which appeared the name of the said Maguire as an independent candidate for member of the assembly. The sample ballots required by the act, upon which also appeared the name of Maguire as an independent candidate for the assembly, had also been duly printed and distributed as required by law. Every step required for the information of the electors of Storey county had been properly taken by the officers authorized to act.

After all these steps had been taken, and on the third or fourth day preceding the election, the said Maguire presented the county clerk of that county with his resignation as a candidate for the office to which he had been duly nominated, which resignation the clerk accepted. The clerk then made requisition upon the secretary of state for additional ballot paper to print and prepare the full allotment due that county as shown by the registration, without the name of Maguire printed thereon. The secretary of state was not able to furnish him with a sufficient quantity of such paper to print the full allotment of ballots for the county, but did supply him with sufficient paper to print a number of ballots largely in excess of the number of votes cast in the county. The clerk, acting in good faith, took a large number of the ballots already printed, containing the name of Maguire, and drew red lines with ink through his name and, together with the ballots last prepared without the name of Maguire printed thereon, and with those with the name of Maguire through which the red lines had been drawn, supplied the various election officers with the full allotment of ballots, but with instructions to the officers not to give out to the electors any of the ballots bearing the red lines until after the others had been exhausted.

In all precincts in Storey county, excepting Gold Hill, no ballots were cast bearing the red lines. In Gold Hill precinct the greater number of the ballots cast were those last prepared, without the name of Maguire, and without the red lines. The election officers of Gold Hill precinct returned nearly 200 ballots of the last prepared as not having been voted, and still in book form. About 55 of ballots bearing the red line through the name of the said Maguire were cast and counted in Gold Hill precinct for the relator, to which respondent has made objections.

The chief purpose and object of the enactment of our Australian ballot law were to prevent fraud and corruption at the elections. As the most potent means for this purpose, it requires that the ballots shall be printed upon the same kind of paper for the various counties and precincts of the state, to be furnished by officers authorized in the matter by the law. Not only is uniformity in paper required, but uni-

formity in printing is regarded as essential to secure the
secrecy of the ballot, through which fraud and corruption
are to be prevented.  In keeping with these requirements of
the law, the legislature required that the elector should use
the cross, or a uniform system of marking his ballot, as indi-
cating his choice or preference of candidates, in a booth con-
structed so as to shield him from the observance of persons
other than the election officers.

In other words, the legislature sought, by a uniform system
of voting, including a uniform kind or character of ballots,
and the printing of the same, and the markings made, to
render the ballots cast absolutely secret.  Therefore uniform-
ity in kind or character of paper used for ballots throughout
the state, uniformity in printing ballots for the various pre-
cincts throughout the state, and uniformity in the character
of markings, as nearly as practicable, by all electors, are the
very foundation and basis of our election law.  No provision
is made whatever, in direct terms, for the resignation of a
candidate nominated for a public office.  If such right exists,
it arises solely by implication, under a strained construction
of the latter clauses of section 7 of the Australian ballot law,
as found in Stats. 1893, p. 113.  If the clause of that pro-
vision by implication authorizes the resignation of a candi-
date for office, by the same rule of construction must it be said
that the resignation must be sent to the convention making
the nomination, or a committee appointed by such conven-
tion, with delegated authority to fill vacancies, or the peti-
tioners nominating such candidate.

Whatever view may be taken of this provision of the law,
it is evident that the officer is authorized to print or write
only the name of the person substituted to fill the vacancy
caused by such resignation.  In no event is he authorized,
directly or indirectly, to make other changes upon the face
of the printed ballot.  When we stop to consider it—changes
necessary to be made upon the tickets of the entire state,
caused by a resignation of a candidate for a state office—the
impracticability of this provision of the law is clearly made
apparent.  But, be the operation and effect of this provision
of the law what it may, it is clear that any attempted changes
in the face of the ballot as printed, whereby more than one

kind of official ballot is prepared and distributed to a pre-
cinct of the county, is clearly in conflict with the spirit and
letter of the law requiring uniformity in the ballots. Any
other construction placed upon the law would, in case of
numerous resignations made immediately preceding the day
of election, confer authority upon the officer to erase from a
part of the printed ballots of any precinct the names of dif-
ferent candidates for various offices, with different colored
inks or pencils, and thus render it possible to have cast in
such precinct different official ballots, distinguishable upon
their faces, and only dependent as to number upon the
excess of the quantity of official ballot paper which may
remain in the hands of the secretary of state after making
the proper allotment to the various counties.

If two kinds of ballots can be used in the same precinct,
then, under like conditions, many different kinds and forms
can likewise be used, and the basis of the law thereby
destroyed, leaving its provisions a dead letter upon the books.
That this uniformity in ballots might be effectual, and the
voter also protected in his constitutional right, and to meet
the contingency arising from the facts in this case, the legis-
lature has made ample provision. It is provided by section
16 of the act that: "In case of prevention of an election in
any precinct by reason of the loss or destruction of the bal-
lots intended for that precinct, or for any other cause, the
inspector or other election officer for the precinct shall make
an affidavit setting forth the fact and transmit it to the
governor of the state. Upon receipt of such affidavit and
upon the application of any candidate for any office to be
voted for by the voters of such precinct, the governor shall
order a new election in such precinct." (Laws, 1891, p. 43.)

It will be thus seen that had the secretary of state no bal-
lot paper whatever, and had the resignation of Maguire been
proper, and had it been necessary to prepare and print bal-
lots upon official ballot paper, and in the form required for
Gold Hill precinct, the voters of that precinct, upon the show-
ing required, could have had an opportunity of expressing
their choice for any and all candidates for office at a different
time and in due form of law. We must therefore conclude
that, rather than destroy the spirit of the law—rather than

destroy its substance—where ample provision is made for the protection of the elector in his rights and for the protection of the candidates in their rights, these ballots bearing the red lines must be excluded. It is claimed that this question has been practically settled the other way by the decision of this court in *Sweeney* v. *Hjul, supra,* and in passing upon the demurrer of the relator to that part of respondent's answer in this action involving the validity of the ballots cast in Reno precinct.

This claim is not tenable. All the ballots in Eureka county passed upon in *Sweeney* v. *Hjul,* and all the ballots voted in Reno precinct and passed upon by the court in this action, were uniform—had printed thereon the names of all the candidates. In this action the ballots under consideration have been cast in the same precinct, with the name of Maguire printed thereon, with red lines drawn through the same, and other ballots have been cast in the same precinct, as official, without the name of Maguire printed thereon, and without the red lines thereon. In other language, the ballots cast in Eureka county and in Reno precinct were uniform, and in strict accordance with the spirit and letter of the law.

In Bullion precinct, in Lander county (overlooked in its proper place in the preparation of the opinion), the relator gains 1 vote over the official count. In East Fork or Gardnerville precinct of Douglas county the relator gains 1 vote over the official count.

We believe it proper to suggest that certain amendments to the law as it exists will obviate many, if not all, of the objections made to the validity of the ballots. It is impossible, under the present system of marking with a pencil, to obtain uniformity in form of markings. This difficulty can be overcome by requiring, as in other states, that the markings shall be made with a rubber stamp. Many objections were also made to ballots because of writing thereon made by election officials. This should be strictly prohibited by the law, except in case of rejected ballots, and in those cases the inspectors should be required to certify over their names, upon the back of the ballot, that it was rejected by them in the count, briefly stating their reasons therefor. We also suggest that the law be so amended as to require, in direct

and specific terms, the place or position where the elector shall make his cross as indicating his choice of candidates. With these amendments, the law which has been so beneficial in its results, and accomplished so much for the purification of our elections, would be nearly perfect, and nearly if not quite all vexatious litigation which has grown up by reason of these defects avoided.

It is gratifying to be able to state that in this protracted proceeding, in which the respective counsel spared neither time nor energy in their efforts to present to the court such facts, if existing, as would impeach the integrity of the votes cast for the opposing candidate in the several counties, no evidence was found to cast a suspicion upon the good faith or integrity of any candidate, officer, or elector. It clearly appears that said election was entirely free from bribery, intimidation, and coercion, which it is said prevail at elections in other states. The illegal markings found upon ballots which necessitated their rejection in this case resulted from the carelessness of voters, and the lack of paying attention to the simple mandatory provisions of the statute.

Finally, the court finds from the evidence that Reinhold Sadler, the respondent, received at said election for the office of governor of the State of Nevada 3,446 legal votes, and no more; that William McMillan, the relator, received at said election for the said office 3,383 legal votes, and no more; and, as conclusions of law, the court finds that said Reinhold Sadler was duly elected to said office for the term of four years from the first Monday in January, A. D. 1899, and is now entitled thereto, and that he is entitled to a judgment to that effect, and judgment against said William McMillan, the relator, for his costs expended in this proceeding.

Judgment is ordered to be entered accordingly.

ON MOTION TO STRIKE OUT AND RETAX COSTS.

*Per Curiam:*

The relator asks the court to strike out of the judgment rendered and entered in this cause on September 20, 1899, the item of $744 25 costs, upon the ground that no memorandum or bill of costs was filed or served within the time required by law or by the rules of the court, also, to

strike from the so-called cost bill certain items for type-writing briefs, testimony, and transcribing same, for the reason that there was no law, agreement, or stipulation authorizing the taxing of said items as costs or disbursements.

The cause was argued and submitted to the court on the 25th day of July, 1899. Both the relator and respondent filed their respective cost bills on that day. It is provided by rule 6 of this court that the expense of printing or typewriting pleadings, affidavits, briefs, or other papers constituting the record in original proceedings upon which the case is heard in this court, required by the rules to be printed or typewritten, shall be allowed as costs, and taxed in bills of costs in the usual mode; provided, that no greater amount than 25 cents per folio of 100 words shall be taxed as costs for printing, and no greater amount than $12\frac{1}{2}$ cents per folio for one copy only shall be taxed as costs for typewriting; all other costs to be taxed by the clerk in accordance with the fee bill.

By the succeeding clause of the same rule it is required that either party desiring to recover as costs his expenses for printing or typewriting in any cause in this court shall, before said cause is submitted, file with the clerk, and serve upon the opposite party, a verified cost bill, setting forth the actual cost of such printing or typewriting, and no greater amount than such actual cost shall be taxed. By the third provision of the same rule it is required that, if either party desires to object to the costs claimed by the other party, he shall, within ten days after the service upon him of a copy of the cost bill, file with the clerk, and serve, his objections. Said objections shall be heard and settled, and the costs taxed, by the clerk. An appeal may be taken from the decision of the clerk, either by written notice of five days, or orally and instanter, to the justices of this court, and the decision of such justices shall be final. If there be no objection to the costs claimed by the party entitled thereto, they shall be taxed as claimed in his cost bill.

The above are the only rules of this court regulating the matter raised by the relator's motion. There is nowhere,

within the rules or within the statutes, provision requiring pleadings, affidavits, briefs, or other papers constituting the record in original proceedings in this court to be printed or typewritten. Such being the case, the expense of typewriting or printing such papers is not necessary costs or expenses, within the meaning of subdivision 1 of rule 6, above cited. Therefore all costs for typewriting charged in respondent's cost bill, and made a part of his judgment, will be stricken out, and the judgment to that extent modified.

As to that part of the relator's motion asking that the entire cost bill and costs as carried into the judgment be stricken out, it is sufficient to say that the objection comes too late, under the last clause of subdivision 3 of rule 6, above cited. It is clearly apparent from the last clause of subdivision 3 that objections, to be available, against costs claimed by a party, must be made within ten days after the filing and service of the cost bill. The opinion in this court was filed on the 20th day of September, 1899. The objections of the relator to the cost bill and the judgment for costs were not filed and served until the 5th day of October, 1899.

Objection is also made by relator to the items of expressage paid on account of the transportation of the ballots from the various counties, to be used as evidence upon the trial of said cause.

We are of the opinion that it was a physical impossibility for the clerks of the respective counties to have safely, and, in some instances, in any manner, produced their ballots in court, in answer to the process of the court, otherwise than by expressing them. Such costs were actually necessary in obedience to the process of the court, and were necessarily incurred by the party.

The objection, therefore, not having been made within the time prescribed by the rules, such costs must be taxed as claimed.

For the same reason the other items to which objections are made must be allowed to stand.

It is therefore ordered that the judgment of the court heretofore entered in this action for costs be modified by reducing the same $90.

ON PETITION FOR REHEARING ON MOTION TO STRIKE OUT AND
RETAX COSTS.

*Per Curiam:*

We have carefully reconsidered the question presented on the motion to retax costs, as suggested in the order reopening the matter, but have been unable to reach a different conclusion. Concede that the cost bills were filed prematurely; it does not necessarily follow, under the facts of the record, that, after the costs have entered into and become a part of the judgment, the judgment should be modified by striking the same therefrom.

Rule 6 of this court is, we believe, broader in its scope than claimed by the counsel for the relator. The language used is broader. It not only covers matters of procedure relating to costs of printing and typewriting transcripts on appeal, and papers in original proceedings, but also the taxation of "all other costs."

In subdivision 3, general language is used, requiring objections to costs claimed to be made within a specified time.

A similar requirement has been incorporated into the rules of the district court, upon the theory, no doubt, to supply what seems to be an omission in the statute. We do not believe that we are required by the rules or the statute, under the facts, to modify the judgment because of irregularity of proceeding, claiming costs which were properly taxable within the meaning of the word, where the party asking the modification is proceeding in an irregular manner. As to those items which could not have been taxed in a regular proceeding, our opinion remains the same. They should be stricken out.

Therefore the items for typewriting, amounting in the aggregate to $131 50, will be stricken out, and the judgment to that extent modified.